REVISED - OCTOBER 16, 2000

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-60019
_____


CARL DANIEL LOCKETT,

                        Petitioner - Appellee-Cross-Appellant,

                        versus

JAMES V. ANDERSON, Superintendent,
Mississippi State Penitentiary,

                        Respondent - Appellant-Cross-Appellee.
_____

Appeal from the United States District Court for the
Southern District of Mississippi
_____
October 13, 2000

Before JOLLY, BENAVIDES, and DENNIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

    We have an appeal by the State and a cross-appeal by the

petitioner in this death penalty case, which arises from the state

courts of Mississippi.  We should first note that the appellant,

Carl Daniel Lockett, killed two persons, Mr. Calhoun (Case #1), and

his wife, Mrs. Calhoun (Case #2), for which he was separately

tried, separately convicted, and separately sentenced.  He is

therefore under two death sentences, which have been consolidated

in this federal habeas proceeding.  This appeal is from the

district court's judgment in the consolidated case granting habeas relief in each of the state court cases. The district court set aside the conviction (and hence the death sentence) in each case because the indictments were defective in that they failed adequately to allege the crime of capital murder under recent Mississippi case law. We have reached a result different from that of the district court and hold only that resentencing is required.

This appeal becomes somewhat confusing, not only because we have two separate and distinct state court cases, but also because we have two separate orders entered by the district court in this consolidated federal case: the October order granting relief in Case #1 as to the death penalty only and denying all habeas relief in Case #2; and the December order, on rehearing of the October order, which granted--on new grounds relating to the defective indictments--relief in each case, both as to conviction and sentence. We will have to address both orders as they relate to each state court case.

Some issues are common between the two cases; some issues apply only to one. With respect to the common issues, we reverse the district court's ruling that the faulty indictments require habeas relief. Consequently, we hold that the conviction for capital murder in each case satisfies constitutional standards. However, in each case we uphold the district court's judgments to

2

the extent that they recognize that Lockett be resentenced. In Case #1, in which the district court first entered judgment requiring resentencing, we must allow the judgment to stand because the state has failed to appeal that judgment. In Case #2, we grant habeas relief, which requires that Lockett be given a new sentencing hearing. We do so because Lockett's counsel failed to conduct a constitutionally adequate investigation into the available mitigating evidence which, if presented, would have created a reasonable probability that an objectively reasonable juror would decide that death was not the appropriate penalty for the murder of Mrs. Calhoun, notwithstanding its cold and merciless cruelty.

In the cross-appeal, Lockett appeals from the October order that rejected all of his claims in each case except for granting relief from the death sentence in Case #1. We affirm the district court's October order in all respects in which it denied relief to Lockett.

I

We first describe briefly Lockett's murder of John and Geraldine Calhoun. Lockett invaded the Calhoun's home in Puckett, Rankin County, Mississippi, on the morning of December 13, 1985. Having watched Mr. Calhoun leave the house with the Calhouns' two

sons, Lockett broke into the home and took Geraldine Calhoun captive. There, he lay in wait for John Calhoun. When Mr. Calhoun entered his family's home, Lockett ambushed him. He shot him four times with a .32 caliber pistol.[1] After killing Mr. Calhoun, Lockett forced Mrs. Calhoun to strip her husband of his wallet, ignoring her pleas that he end her own life quickly. Lockett then forced Mrs. Calhoun into the Calhoun's commandeered car and drove to an abandoned chicken house, owned by his grandmother. There, he executed Mrs. Calhoun with two .22 caliber rifle shots to her head. Lockett stripped the Calhoun's car for various parts, hid those items in the chicken house, walked through the woods to his home, and fell asleep.

The next day, following obvious clues pointing to him as the killer, the authorities arrested Lockett. After his arrest, without assistance of counsel, Lockett confessed fully to his actions. With respect to Lockett's confession, the Mississippi Supreme Court said only this: "After waiving his rights at the Rankin County Sheriff's office, Lockett confessed. Subsequently,

---

[1]Relevant to whether this act was "especially heinous," the Mississippi Supreme Court described Lockett's shooting of Mr. Calhoun in the following manner: "As Mr. Calhoun walked through the front door, Lockett launched a volley of gunfire from the .32 pistol. Although Mr. Calhoun was struck by the first shot, Lockett fired 3-4 more times." Lockett v. State, 517 So.2d 1317, 1320 (Miss. 1988).

4

another waiver was made and Lockett tendered a complete tape-recorded account of the crime."

Separate juries convicted Lockett after individual two-day trials spaced one month apart. The murder trial of Mr. Calhoun started April 1, 1986, and the jury returned a verdict of guilty of capital murder on April 2, 1986. Lockett was represented by the same trial counsel for both trials. His attorney presented a very brief defense; he gave no opening statement and put no witnesses on the stand. At the sentencing phases of each trial, which will be explored more fully, Lockett's counsel put four family members on the stand in Case #1, and one in Case #2.

II

Not unlike other capital cases, this appeal has a lengthy procedural history. On September 30, 1987, on automatic review, the Mississippi Supreme Court affirmed Lockett's conviction for the murder of Mr. Calhoun. See Lockett v. State, 517 So.2d 1317 (Miss. 1987). The state supreme court denied Lockett's petition for rehearing on January 13, 1988. The United States Supreme Court denied Lockett's petition for writ of certiorari on June 20, 1988. See 487 U.S. 1210 (1988). Subsequently, the Mississippi Supreme Court denied Lockett's motion for post-conviction relief. See Lockett v. State, 614 So.2d 888 (Miss. 1992). Lockett's petition for writ of certiorari to this denial was also rejected. See 510

5

U.S. 1040, 114 S.Ct. 681, *reh'g denied*, 510 U.S. 1173, 114 S.Ct. 1212 (1994). Thereafter, the Mississippi Supreme Court rejected Lockett's second application for state post-conviction relief on April 13, 1994, deeming it to be time barred and a successive petition. See Lockett v. State, 656 So.2d 68 (Miss. 1995).

Lockett's conviction and appeals with respect to the murder of Mrs. Calhoun followed a similar path. Convicted and sentenced on May 6, 1986, Lockett's automatic appeal to the Mississippi Supreme Court was rejected on September 30, 1987. See Lockett v. State, 517 So.2d 1346 (Miss. 1987). Lockett's petition for writ of certiorari to the United States Supreme Court was rejected. See 487 U.S. 1210, *reh'g denied*, 487 U.S. 1250 (1988). Thereafter, the Mississippi Supreme Court denied post-conviction relief, see Lockett v. State, 614 So.2d 898 (Miss. 1992), and the United States Supreme Court denied the petition for writ of certiorari. See 510 U.S. 1040, 114 S.Ct. 681, *reh'g denied*, 510 U.S. 1173, 114 S.Ct. 1212 (1994).

Lockett then sought habeas relief in the federal district court. In an order entered October 16, 1997, the district court initially denied in part and granted in part Lockett's habeas petition. In that order, the district court reversed Lockett's sentence with respect to Mr. Calhoun's murder only, holding that the "especially heinous" instruction was improperly given on the facts of the case. Following Lockett's timely motion to alter or amend,

6

the district court reversed the convictions and sentences of both Mr. and Mrs. Calhoun, but this time the district court took a different tact. In an order entered December 16, 1997, the district court concluded that the recently decided state supreme court decision, State v. Berryhill, supra, 703 So.2d 250, issued October 23, 1997, meant that the indictment in each case was fatally defective, and that this decision retroactively applied to these 1986 convictions. The district court therefore granted habeas relief as to both convictions (and hence to the death sentences as well).

III

Lockett filed his federal petition for writ of habeas corpus on November 20, 1995, prior to the enactment on April 24, 1996, of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Therefore, the AEDPA does not apply to Lockett's petition. See Lindh v. Murphy, 521 U.S. 320, 326-27 (1997). We therefore apply pre-AEDPA standards to the issues raised in this case. See Green v. Johnson, 116 F.3d 1115, 1119-20 (5th Cir. 1997).

IV

We first consider whether we have jurisdiction to review the State's challenge to the district court's October 1997 order, which only vacated Lockett's death sentence for the murder of John

Calhoun. As we have noted, the district court reversed this conviction on the grounds that the "especially heinous, atrocious, or cruel" aggravating circumstance instruction should not have been given to the jury, finding that there was insufficient evidence for any rational trier of fact to conclude that the circumstance was applicable.

We think that the State has waived any appeal of this October ruling. The only notice of appeal the State has filed is limited on its face to the district court's December order. It states quite specifically:

> [T]he Respondents . . . hereby appeal . . . from the Order granting the petition for writ of habeas corpus vacating two capital murder convictions and sentences of death on the condition that the State of Mississippi either (1) retry Lockett within ninety days, (2) seek a new indictment against Lockett within ninety days or (3) resentence Lockett for simple murder, entered on December 16, 1997 . . . .

The general rule governing the scope of a notice of appeal states:

> Where the appellant notices the appeal of a specified judgment only or a part thereof, . . . this court has no jurisdiction to review other judgments or issues which are not expressly referred to and which are not impliedly intended for appeal.

Capital Parks, Inc. v. Southeastern Advert. & Sales Sys., Inc., 30 F.3d 627, 630 (5th Cir. 1994) (citation omitted). Federal Rule of Appellate Procedure 3(c)(1)(B) states that "the notice of appeal must designate the judgment, order, or part thereof being appealed."

8

Although "[a] mistake in designating orders to be appealed does not bar review if the intent to appeal a particular judgment can be fairly inferred and if the appellee is not prejudiced or misled by the mistake," New York Life Ins. Co. v. Deshotel, 142 F.3d 873, 884 (5th Cir. 1998); Foman v. Davis, 371 U.S. 178 (1962),[2] we simply cannot say that the State's notice of appeal evidences any mistake that would provide us with jurisdiction here.

Although a mere technical error in designating the proper judgment being appealed will not divest us of jurisdiction, our review of the case law addressing such "technical" errors demonstrates that the error committed here does not fall into that category. We can overlook such "technical" errors where, for instance, a motion for reconsideration has been denied, and the appellant appeals only from the denial of this Rule 59 motion. In that case, we can infer that the party meant to appeal the adverse underlying judgment. See, e.g., United States v. One 1988 Dodge Pickup, 959 F.2d 37, 41 n.5 (5th Cir. 1992); Fed. Trade Comm'n v. Hughes, 891 F.2d 589, 590-91 & n.1 (5th Cir. 1990); United States

---

[2]See also 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 203.17[2], at 86-87 (2d ed. 1996) ("[A]s long as the intent to appeal from a specific judgment can be fairly inferred from the notice and the appellee is not misled by the mistake," the jurisdiction of the appellate court is not barred by mistake in notice of appeal.).

<u>v. O'Keefe</u>, 128 F.3d 885, 890 (5th Cir. 1997).[3]  The same is true with respect to a notice of appeal from the denial of a motion for a new trial under Rule 59(e).  <u>See</u> <u>Hogue v. Royse City, Tex.</u>, 939 F.2d 1249, 1251-52 (5th Cir. 1991).[4]  The critical distinguishing feature of all these cases in relation to the instant matter, however, is that Lockett's Rule 59 motion was not denied, but <u>granted</u>.  After granting this motion, the district court entered an entirely new judgment, granting relief not to one death sentence, but to both, and for new and different reasons.

The State's notice of appeal is explicit in stating that the appeal is from the district court's December order.  It references that order specifically, described by its date, without even an

---

[3]We noted in <u>O'Keefe</u>, however, that "[w]hile a policy of liberal interpretation of notices of appeal is the rule when the intent to appeal an unmentioned or mislabeled ruling is clear and no prejudice will result to the opposing party, when only a specified judgment or part thereof is noticed, the notice of appeal is generally strictly construed."  <u>Id.</u> at 890 n.4 (citing <u>C.A. May Marine Supply Co. v. Brunswick Corp.</u>, 649 F.2d 1049, 1055-56 (5th Cir. 1981)).

[4]Indeed, in <u>Hogue</u> we quoted from our decision in <u>Osterberger v. Relocation Realty Service Corp.</u>, 921 F.2d 72, 73-74 (5th Cir. 1991):  "[E]very Circuit, including the Fifth, has treated an appeal from an order denying a motion for new trial as an appeal from the adverse judgment itself."  Moreover, we stated: "Here, Hogue's intent to appeal a final judgment was obvious.  To his second notice of appeal, Hogue attached a copy of his original notice of appeal [appealing adverse grant of summary judgment] and the district court's final order.  Taking the two notices and the appeal papers together, we conclude that Hogue's intention to seek review of the summary judgment was manifest."  <u>Id.</u> at 1252.

10

oblique reference to the October order. It refers to the district court's order granting habeas for "two capital murder convictions and sentences." The October order only granted habeas as to one of the murder convictions. Furthermore, the intent to appeal only from the December order is evidenced by the State's reference to the December order's grant of habeas "on the condition" of the options set forth by the district court. No such options attached to the grant of Lockett's petition with respect to the "especially heinous" factor in the October order. Nor is there anything inherent in the December order appealed from that would provide reason to believe that the October order also is in play on this appeal. Furthermore, the State's notice of appeal reveals nothing to suggest a mistake. Indeed, at oral argument, the State essentially admitted to its error here, but pled ignorance of the appellate rules. The State does not appeal the wrong order; instead, it merely does not appeal the earlier judgment. See, e.g., C.A. May Marine Supply Co. v. Brunswick Corp., 649 F.2d 1049, 1056 (5th Cir. 1974) ("Where parts of a judgment are truly independent, there is more likelihood that the designation of a particular part in the notice of appeal will be construed as an intent to leave the unmentioned portions undisturbed.").

Thus, because the notice of appeal leaves no room for doubt as to its scope, we are unable to assert jurisdiction over the district

court's October 1997 order granting habeas relief as to the death sentence in Case #1. Given our lack of jurisdiction, that order must stand. We turn now to the appeal and cross-appeal properly before us.

V

A

The State of Mississippi's Appeal

First, we address the State's appeal of the district court's December 16, 1997 order vacating each of Lockett's convictions and sentences. Ruling on Lockett's Rule 59(e) motion to alter the October 16, 1997 judgment, the district court held that the indictments against Lockett were fatally defective as a matter of state law for failure to state with specificity the underlying crime upon which the capital murders were predicated. Specifically, the district court reversed Lockett's convictions (and hence his sentences) on the basis of a Mississippi Supreme Court decision, State v. Berryhill, 703 So.2d 250 (Miss. 1997), issued nine years after Lockett's trial and two days after the district court entered its October 16 order rejecting such a claim. The district court held that Berryhill applied retroactively, and that under this state supreme court case the indictments on which the jury convicted Lockett were fatally infirm because of their failure to set forth

12

the elements of the burglary offense on which the capital murder charge was based.

B

Before addressing the <u>Berryhill</u> case, we first note that the Mississippi Supreme Court held that this issue was procedurally barred. Lockett, however, argued before that court that his failure to comply with procedural rules did not bar consideration by the court because "matters of jurisdiction may be raised for the first time on appeal." 656 So.2d at 73. The court considered Lockett's sufficiency of the indictment argument (after holding that the arguments were procedurally barred by state statute) and, in reference to the claim that the matter was jurisdictional, stated, albeit without analysis, that "[w]e are not persuaded." <u>Id.</u>[5]

---

[5]In relevant part, the Mississippi Supreme Court's opinion reads:

> CLAIM 1. THE INDICTMENT IS VOID BECAUSE IT FAILS TO SET FORTH THE ESSENTIAL ELEMENTS OF THE UNDERLYING OFFENSE OF BURGLARY.
> Lockett alleges his indictment for capital murder is defective because it failed, without uncertainty or ambiguity, to identify the essential elements of the underlying felony offense of burglary. . . . According to Lockett, a mere allegation of an "intent to ... steal" is insufficient to charge the burglarious intent to commit larceny, the intended crime. Lockett alleges the indictment should have contained additional allegations focusing upon ownership and asportation of the personal property as well as a specific intent to permanently deprive another of the personal property. The argument is doubly barred.
>     This concern about the indictment was not expressed

13

The rule in our circuit is that "[w]hen it appears . . . that the sufficiency of the indictment was squarely presented to the highest court of the state on appeal, and the court held that the trial court had jurisdiction over the case, the issue is foreclosed to a federal habeas court." Murphy v. Beto, 416 F.2d 98, 100 (5th Cir. 1969). See also Alexander v. McCotter, 775 F.2d 595, 598 (5th Cir. 1985) ("[T]he sufficiency of a state indictment is not a matter for federal habeas corpus review unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction."). The clear meaning of the court's rejection of Lockett's argument that the procedural bar did not apply is that any

---

at any time during Lockett's trial. Nor was it one of the sixteen (16) issues raised on direct appeal to this Court. Finally, it was not among the fifteen (15) individual grounds cited in support of the relief requested in Lockett's first application for post-conviction relief. Accordingly, Lockett is barred by virtue of the time bar found in § 99-39-5(2) and the successive writ bar contained in § 99-39-27(9) from raising the matter at this late hour.

Lockett, however, argues that a time bar and a procedural bar have no applicability here because matters of jurisdiction may be raised for the first time on appeal, the error is both plain and fundamental constitutional error, and the failure of Lockett's previous counsel to raise and pursue the issue either at trial or on direct appeal constitutes ineffective assistance of counsel. We are not persuaded. Three (3) sets of attorneys have failed to raise this issue which is both time barred and successive writ barred. (Emphasis supplied).

14

error as to the failure of the indictments to allege the elements of burglary was not jurisdictional.

Lockett argues, however, that we should disregard this holding of the state supreme court because in <u>Berryhill</u> the court changed its position and held that a capital murder indictment, predicated on the felony of burglary, was fatally defective in the absence of an allegation of the elements of the crime of burglary. In response to Lockett's argument, we shall examine the question of whether the capital murder indictments against Lockett charge the crime of capital murder under the law of Mississippi.

1

(a)

The Mississippi capital murder statute, Miss. Code Ann. § 97-3-19, reads:

> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
> ...
> (e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery . . . or in any attempt to commit such felonies.

Furthermore, the crime of burglary requires "[the] breaking and entering [of] the dwelling house or inner door of such dwelling house of another . . . with intent to commit some crime therein." Miss. Code Ann. § 97-17-23.

15

Lockett's two indictments are similar with respect to the allegations of burglary. The indictment from Case #2 (Mrs. Calhoun) states:

> Carl Daniel Lockett . . . did . . . wilfully, unlawfully, feloniously and of his malice aforethought kill and murder Geraldine Calhoun, a human being, while . . . Lockett, was engaged in the crimes of burglary, kidnapping and robbery, in that he had forcibly, burglariously, unlawful [sic] wilfully and feloniously broken and entered into the dwelling house of the said Geraldine Calhoun and John Earl Calhoun with the intent to, once inside, steal the personal property situated therein and to unlawfully do violence to the persons situated therein; and further in that he did then wilfully, unlawfully, feloniously, violently and forcibly seize the person of Geraldine Calhoun and first confine her in such house then took her from such place where she had a right to be to another place against her will and without her consent with the intent to secretly confine her; further in that he did violently, wilfully, unlawfully, feloniously and forcibly take, steal, seize, rob and carry away from the person and from the presence of the said John Earl Calhoun a certain billfold and its contents of value and being the personal property of the said John Earl Calhoun; and finally in that he did wilfully, unlawfully, feloniously, violently and forcibly take, steal, seize, rob and carry away from the presence of the said Geraldine Calhoun the radio, radio speakers, sunvisors, cassette tapes and the rearview mirror one gray 1984 Oldsmobile . . . . said items taken therefrom being of value and being the personal property of the said John Earl Calhoun and Geraldine Calhoun: and the Grand Jury charges that such capital murder is in violation of § 97-3-19(2)(e) of the Mississippi Code of 1972, as amended.

We find the indictments sufficient to allege capital murder in the state of Mississippi. First, we believe this case is distinguishable from Berryhill on the facts. Second, we find the indictments valid even without the burglary charge. Finally, we

16

believe the district court misapplied <u>Berryhill</u> to the facts in this case by confusing the requirements of proof with the requirements of pleading.

(b)

The Mississippi Supreme Court in <u>Berryhill</u> addressed the question of whether a capital murder indictment that is predicated on the underlying crime of burglary must state the felony that the defendant intended to accomplish in the course of breaking and entering.

In <u>Berryhill</u>, the defendant was indicted for capital murder while engaged in the commission of a burglary; the indictment alleged <u>only</u> burglary to support the capital murder charge. Furthermore, Berryhill's indictment failed to charge <u>any</u> underlying offense to comprise the charge of burglary. During pretrial motions, Berryhill renewed a motion to quash the indictment, arguing that he had first been informed by the State that he would have to defend against a charge of burglary with the intent to commit an assault, and then was later told that he might be required to defend against burglary with intent to commit kidnaping or attempted kidnaping. The court quashed the indictment and held that such indictments must assert with specificity the felony that constitutes the burglary charge.

17

The court gave two reasons for this requirement.  First, the court found that such a pleading rule was required to provide notice to the defendant of what the State intended to prove, stating that "an indictment that fails to give notice to a defendant of the charges to which he has been hailed into court to defend will fail to provide him an opportunity to prepare a defense."  703 So.2d at 255.[6]  Second, the court found the specificity requirement in pleading necessary to satisfy the "well-settled law that a defendant cannot be put in jeopardy for crimes except those which a grand jury of his peers has presented." Id. at 257.

The Berryhill court found that the indictment in that case failed to satisfy each of these concerns.  It determined that Berryhill had not been given proper notice of the charges against him because the prosecutor had alleged no felony intended by the defendant in the indictment that would support the burglary charge.[7] The court further found that allowing prosecutors--not the

_____

[6]The court found this notice requirement implicit in the purposes of the indictment generally, noting that "[w]e have repeatedly held that an indictment must give notice of the nature and cause of the charges, although a reasonably concise statement of the crime will suffice."  703 So.2d at 255-56 (citation omitted).

[7]The court noted the prosecutorial failings in this case: "As the facts in this case demonstrate, a defendant such as Berryhill who has been indicted without specifying the burglary may find out on the eve of trial that the State might try to prove the burglary on different theories . . . Such 'trial by ambush' is at odds with this Court's jurisprudence."  Id. at 256.

indictment--to apprise defendants of the underlying felony contravened the principle that only grand juries can charge defendants. The court noted that the prosecutor "was clearly considering various theories of what might constitute the burglary" until the day before trial. Id. at 257. Leaving such discretion in the hands of the prosecutor to decide which felony to pick for purposes of prosecution threatened the defendant's right to protection from double jeopardy. The court therefore held that a capital murder indictment predicated upon burglary must specify the defendant's intended crime upon breaking and entering.

(c)

Lockett's case is materially distinguishable from Berryhill on more than one basis. First, Lockett's indictments adequately serve both purposes that troubled the Berryhill court. Lockett had ample notice of the charges against him and the prosecutors were never in a position to supplant the requisite intent for the burglary charge outside the confines of the grand jury. Here, the indictment notified Lockett that he would be prosecuted for burglary because he had the intent to steal personal property and the intent to unlawfully do violence.[8] On the other hand, the indictment in

_____

[8]Lockett's indictments were quite specific regarding the crime underlying the burglary count. The indictments charged him with the intent to "steal the personal property" inside the Calhoun home and "unlawfully do violence to the persons situated therein."

19

Berryhill failed to give notice of any underlying act to support the burglary charge.  Second, the indictment--that is, the grand jury, not the prosecuting attorney--provided the specific intent allegation upon which this prosecution was founded.  See Berryhill, 703 So.2d at 252.

In addition, Lockett's indictments also specified alternative predicate offenses to the capital murder charge.  The indictments included burglary, kidnaping, and robbery[9] as alternative predicate offenses, each sufficient under Mississippi law to support a capital murder charge.[10]

(d)

More fundamentally, we believe the principle stated in Berryhill--that a capital murder indictment fails adequately to state the crime of capital murder unless the indictment properly charges a felony set out in the capital murder statute--is fully satisfied here.  The sole issue here is whether Lockett's indictment states the crime of capital murder adequately under the Mississippi statute to satisfy federal constitutional standards. We think there is no doubt that it does.  The capital murder statute requires a

---

[9]The Berryhill court noted that "[i]n the context of capital murder, this Court has further held that a bare allegation of robbery in an indictment, without further specification of the facts in support of that, is sufficient."  703 So.2d at 256.  See also Mackbee v. State, 575 So.2d 16, 35 (Miss. 1990).

[10]See Miss. Code Ann. § 97-3-19(2)(e).

20

"killing" by an individual "engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, . . . <u>or</u> nonconsensual unnatural intercourse with mankind". Miss. Code Ann. § 97-3-19(2)(e) (emphasis added). The state need properly to allege only one of these underlying crimes to support a capital murder charge. The indictment in <u>Berryhill</u> was defective because it charged <u>only</u> burglary, requiring the state properly to charge the defendant's specific intent for breaking and entering, in order to convict on capital murder.[11] The Lockett indictment, on the other hand, alleged multiple alternative supporting felonies. Thus, even if we agreed with the district court that "a portion of each indictment charging Lockett with capital murder based upon the underlying felony of burglary is fatally defective," the indictments still state a crime under the capital murder statute because they adequately charge alternative felonies that support capital murder. Stated differently, if every allegation relating to burglary were removed from the indictment, it survives nonetheless as the work of the grand jury upon which the state can prosecute capital murder. Thus, even if <u>Berryhill</u> were applicable to Lockett's case, no jurisdictional question could be successfully raised in this capital

---

[11]Berryhill was originally indicted for capital murder while engaged in the commission of a burglary, attempted kidnaping of a child, and possession of a firearm by a convicted felon. All predicate crimes with the exception of burglary were severed from the indictment pursuant to pretrial motion.

21

murder prosecution and hence no basis for federal habeas relief would exist.

2

In reversing the district court's December order, we find that the ultimate flaw in the court's opinion lies in a misapplication of <u>Fisher v. State</u>, 481 So.2d 203 (Miss. 1985). We should emphasize that the only question raised by <u>Berryhill</u> relates to the adequacy of the charge in the indictment. <u>Fisher</u> relates only to proof of the charge in the indictment. In this appeal, we simply are not called upon to address any question concerning the sufficiency of the evidence supporting these convictions.

The district court did acknowledge that "the portion of the indictments attempting to define larceny as the underlying felony to support the burglary charge, although inartfully stated, adequately apprised Lockett of the basis for that portion of the burglary charge." However, the court then determined that the "to unlawfully do violence" portion of the indictment failed to define a crime and thus failed to support sufficiently the burglary charge. The district court, citing <u>Fisher</u>, found that, because "the state undertook the burden of <u>proving</u>" (emphasis supplied) burglary and failed to do so, the convictions should be vacated.[12]

---

[12]It seems clear from the evidence, irrespective of the charges in the indictment, that the state actually <u>proved</u> an overwhelming case of felony burglary, including breaking and entering with

22

The defendant in _Fisher_ was charged with capital murder predicated on the crimes of rape and robbery. Fisher was convicted of the capital murder charge and later challenged the sufficiency of the evidence presented at trial to establish the underlying felonies of rape and robbery. Thus, the Mississippi Supreme Court in _Fisher_ was concerned with evidence, stating that "[h]ere, Fisher tests the legal sufficiency of the evidence supporting the verdict of guilty on each element of the offense of capital murder." 481 So.2d at 212. Noting that a "capital murder conviction must be supported by evidence legally sufficient to support a conviction of both the murder and the underlying felony had either been charged alone," the court found that the state had undertaken the burden of proving both underlying felonies in the indictment.[13] Because the state failed to present sufficient evidence to establish that Fisher committed rape _and_ robbery, the court overturned the conviction.

Thus, it appears that the district court commingled the issues of pleading and proof: while acknowledging that burglary was adequately alleged with respect to intent to commit theft, it relied on a case addressing only the issue of proof to hold that the

---

intent to engage in an unlawful crime of violence, i.e., the murder of Mr. Calhoun.

[13]_Id._ The court found that the state had undertaken the burden to prove both rape and robbery because, "in both the indictment and the jury instructions, the underlying felonies are stated 'rape and robbery.'"

23

indictment was defective in failing to adequately allege burglary based on intent to assault. In short, <u>Fisher</u> does not make requirements on the indictment; it makes requirements on proof. Thus, the district court's reliance on <u>Fisher</u> to hold these indictments were somehow fatally defective was erroneous.

3

For the foregoing reasons, we find that Lockett's indictments sufficiently allege the essential elements of the crime of capital murder. Given the state supreme court's holding that any failings of the indictments was not jurisdictional, the factual differences between <u>Berryhill</u> and this case, and the inapplicability of <u>Berryhill</u> and <u>Fisher</u>, we reverse the December judgment of the district court.

VI

<u>Lockett's Cross-Appeal</u>

Because we reverse the district court's December judgment, we must consider Lockett's cross-appeal. The district court's December 16, 1997 order vacating Lockett's two death sentences did not address or otherwise affect the district court's October 16, 1997 order insofar as it denied other claims raised in Lockett's habeas petition. We can divide Lockett's cross-appeal into two categories. First, Lockett raises several claims that address the validity of his conviction. Second, he raises claims that pertain

24

only to the validity of his sentence.  We state the obvious to say, if there is error with respect to his conviction, the remedy would be to remand for a new trial and, assuming reconviction, for resentencing.  If there is error in the sentencing, we would remand only for a new sentencing procedure upon the election of the State.  We should further note that because we lack appellate jurisdiction over the grant of habeas relief in Case #1, which set aside the death sentence imposed on Lockett in that case, it is unnecessary to address further the other sentencing issues there; that is to say that we address only the sentencing claims arising from Case #2.  We turn first to the allegations of conviction-related error.

A

## Issues Arising from Guilt Phase of the Trial

Lockett argues that the prosecution's use of its peremptory challenges to exclude all black jurors from both juries violated the constitutional guarantees set forth in Batson v. Kentucky, 476 U.S. 79 (1986).  We find no constitutional violation here.

1

The trial involving the murder of Mr. Calhoun (Case #1) began one month before Batson, in which the Supreme Court stated that any party seeking to exercise a peremptory challenge to strike black members of a jury venire must provide a "neutral explanation" for challenging such potential jurors.  476 U.S. at 96-97.  The second

trial, involving the murder of Mrs. Calhoun (Case #2), took place shortly after the Batson decision was rendered.

Notwithstanding the fact that the Supreme Court has held that any pre-Batson challenges should be treated under the standards set forth in Batson, see Ford v. Georgia, 498 U.S. 411, 420 (1991), Lockett has failed to preserve this issue by not contemporaneously objecting at trial.[14] Because no specific objection was raised at the time of the first trial (Case #1), we find no evidence that any inquiry was made as to the prosecutor's rationale for excluding all black members of the jury pool during the trial. Thus, we have no facts or arguments before us upon which to base a Batson inquiry. As did the Mississippi Supreme Court, we find this issue procedurally barred as a matter of law.

2

We have a different situation with respect to Case #2. Lockett's counsel raised a Batson objection to the prosecution's use of peremptory challenges during the trial of Mrs. Calhoun's murder. Although Lockett's counsel made a prima facie case of discrimination

---

[14]The district court observed that the Mississippi state courts had found this claim to be procedurally barred, but did not reach this conclusion itself. Instead, it addressed the argument on the merits, albeit noting that it did so "out of an abundance of caution."

in Case #2,[15] the trial court evaluated each of the reasons given by the prosecution with respect to the five individuals struck. The trial court entered a factual finding that the reasons articulated by the prosecutor were racially neutral. These reasons were evaluated in detail by the Mississippi Supreme Court, which reached the same conclusion. See 517 So.2d at 1351-52. There is no evidence to suggest that these race neutral explanations were actually false. Certainly, mere cognizance of racial identity does not necessarily establish, or even imply, racial discrimination. The standard of review we apply is stated in the applicable pre-amendment habeas statute: The state court's determination of a factual issue "shall be presumed to be correct," unless a federal court, upon considering the relevant part of the state court record, "concludes that such factual determination is not fairly supported by the record." 28 U.S.C. § 2254(d)(8), amended by 28 U.S.C. § 2254(e)(1) (1996). Lockett argues that this presumption of correctness should not apply because the trial judge's reason for accepting the prosecutor's rationale for at least one juror--a lack

---

[15]The Mississippi Supreme Court stated: "[t]he prosecutor used five of his first seven challenges to eliminate all black jurors from the venire." 517 So.2d at 1350. The five jurors struck are detailed in the Mississippi Supreme Court opinion. See 517 So.2d at 1350. In short, they were: a 25-year-old with an eleventh grade education; a 49-year-old preacher; a 35-year-old housewife who did not reveal her brother's conviction for armed robbery; a 38-year-old concerned about possible sequestration (in a two-day trial); and a 25-year-old wearing a hat into the courtroom.

27

of education--was equally applicable to at least seven white jurors who lacked a high school education but were left on the venire panel.[16]

The burden of demonstrating that a constitutional violation occurred is, of course, on a habeas petitioner.  See Batson, 476 U.S. at 96.  Lockett has failed to establish that a Batson violation actually occurred.  First, the evidence that several whites served as jurors despite their lack of a high school diploma is information developed and presented only in posttrial proceedings.  No evidence has been adduced to establish that the judge at Lockett's trial knew that some whites without a high school education were serving as jurors.  In fact, the record suggests that the contrary was true.[17]  Second, the record does not establish clearly that the prosecution was consciously aware of the fact that it was accepting five white jurors without high school diplomas.  Third, the record does not establish that the asserted race-neutral explanation by the

_____

[16]The record confirms that at least five white jurors who were accepted by the prosecution and served on the jury had not graduated from high school.

[17]During jury selection, the judge ruled the prosecutor's reasons for exercising peremptory strikes were legitimate by stating, "I would not want a young, single juror with a marginal educational background."  This statement certainly suggests that the judge had no idea others without high school educations had been selected for jury duty.

28

prosecution was applied only to black persons.[18] Finally, it is not at all clear that the black juror in question was struck based merely on his lack of a high school education. The prosecutor gave several other reasons for his exercise of a peremptory strike: "He is young, twenty-two years old, . . . [h]e is not married. I take that as an indication of being less stable than some of these other jurors."

In sum, given a race-neutral explanation that was not proved pretextual, and given the deference we owe to fact-finding of the state courts and the district court, we hold that the petitioner has failed to meet his burden of establishing that an actual Batson constitutional violation occurred at trial.

3[19] [20] [21]

---

[18]The prosecution exercised at least one other peremptory challenge on a white member of the jury pool based on a lack of education.

[19]Lockett argues that the district court's December grant of relief with respect to the indictments also acknowledged that the jury instructions were in error, but did not grant relief on this ground. We find this claim to be procedurally barred.

[20]We also reject Lockett's request for an evidentiary hearing on whether the jury saw Lockett in shackles when he was brought into the courtroom. The district court was not clearly erroneous when it held as a finding of fact that the jury could not have seen Lockett in handcuffs (not, as alleged, shackles) for the brief time he was so restrained in the courtroom. Indeed, Lockett received an evidentiary hearing on this claim in state court. There, the trial judge found no factual basis for the claim. This finding of fact is presumed to be correct. See 28 U.S.C. § 2254(d)(8), amended by 28 U.S.C. § 2254(e)(1) (1996). Lockett is entitled to no relief on

Lockett next argues that his confessions were obtained in violation of his Sixth Amendment rights to counsel and due process and were involuntary. There is some evidence that when Lockett was arrested he was either intoxicated and/or under the influence of drugs. Lockett argues that because the officers interrogating him declined to tell him that he had court-appointed counsel immediately, and because it was unclear whether Lockett had recovered from his intoxicated state at the time of his confessions, his rights were violated and the writ should be granted.

We agree with the district court's conclusion that this claim is procedurally barred. In Lockett's second motion for post-conviction relief in Case #1, the Mississippi Supreme Court stated that:

> None of the fifteen (15) grounds contained in Lockett's first application for post-conviction relief filed by his second set of lawyers assailed the voluntariness of Lockett's confession . . . It is too late now to

this claim.

[21]Lockett urges that the district court erred by finding no prosecutorial misconduct. He argues that the prosecutor misled the jury regarding the alternative to the death sentence in violation of <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985), and <u>Williams v. State</u>, 445 So.2d 798, 813 (Miss. 1984) (en banc). Lockett also argues that the prosecutor in Case #1 improperly criticized his failure to express remorse.

These claims are barred, as the Mississippi Supreme Court concluded, because Lockett failed to object at trial. Moreover, we simply find no constitutional violation in the prosecutor's conduct. At most, even assuming error, the comments were harmless and in no way prejudiced the outcome of the trial.

reconstitute this issue in a second and successive application for post-conviction relief.

*Lockett*, 656 So.2d at 74. The district court determined that Lockett failed to show cause and prejudice for his failure to raise the voluntariness claim before his second post-conviction relief motion. We agree with the district court that "[a] blanket assertion that all previous counsel were ineffective is not sufficient to establish such cause." Because the claim was barred by the state court based upon an adequate and independent state ground, and because Lockett has failed to show cause and prejudice, we find Lockett's claim that his confessions were coerced to be procedurally barred.[22] Thus, Lockett is not entitled to habeas relief on this ground.

4[23] [24]

---

[22]Despite the procedural bar, we find the evidence overwhelmingly establishes that Lockett's confessions were voluntary. A review of the waivers that Lockett signed provides ample evidence of the voluntariness of his confessions. The second waiver, signed after meeting with his family, clearly states, "I do not want a lawyer at this time. I understand and know what I am doing."

[23]Lockett argues that the trial court's failure to issue a requested manslaughter instruction in Case #2 violated his Eighth and Fourteenth Amendment rights. The district court held this claim to be barred procedurally. We affirm that finding.

Lockett's substantive arguments are also unavailing. He has failed to show that the jury rationally could acquit on the capital crime and convict for the non-capital crime of manslaughter. Giving the jury an option of finding guilt for non-capital murder is sufficient. See, e.g., Aldridge v. Scott, 41 F.3d 213, 220 (5th Cir. 1994) ("Our reading of *Beck* and *Schad* instructs us that the

31

Next, Lockett argues that the jury charge on capital murder deprived him of his right to a unanimous verdict in Case #1 (Mr. Calhoun).  The instruction asked the jury to consider "whether the capital offense was committed while the defendant was engaged in burglary, robbery and/or kidnapping, or in an attempt to commit one

---

trial court was not constitutionally bound to provide a wider menu of jury instructions.  Instead, because the jury had the viable option to choose murder over capital murder, we are satisfied that the option ensured the reliability of the jury's capital murder verdict.").  Lockett has not shown a constitutional violation.

[24]Lockett argues that the introduction of evidence and argument at the respective trials concerning the murder of the other spouse violated his Fourteenth Amendment rights.  In rejecting this claim, the district court stated, referring to Case #1, that "the killing of Mrs. Calhoun was clearly motivated by Lockett's desire to effect a successful escape from his murder of Mr. Calhoun.  Thus, the mention of her fate was relevant to establish an unlawful motive in the killing of her husband."
        Our holding in Robinson v. Whitley, 2 F.3d 562, 567 (5th Cir. 1993), stated that the prohibition to admission of "other crimes" evidence does not apply if the sequence of events formed "one continuous transaction."  Moreover, a state law evidentiary error may entitle a petitioner to habeas relief only where the violation is "of such magnitude as to constitute a denial of 'fundamental fairness.'"  Bryson v. Alabama, 634 F.2d 862, 864-65 (5th Cir. Unit B 1981) (citation omitted).
        We do not think the trial judge erred in concluding that the two murders were so interconnected and interrelated as to form one continuous transaction.  Here, Lockett committed two murders, one after the other, closely spaced in time and with a virtually inseparable, interrelated connection.  We especially think that reference to the murder of Mr. Calhoun in Lockett's trial for the murder of Mrs. Calhoun was unavoidable insomuch as it both completes the picture of the sequence of events, see United States v. Weeks, 716 F.2d 830, 832 (5th Cir. 1983) (direct appeal), and explains a motive for Lockett's decision to kill Mrs. Calhoun.  See Smith v. State, 499 So.2d 750, 755-57 (Miss. 1986); Fed.R.Evid. 404(b).  Any error here simply does not rise to the level of fundamental unfairness that would allow for habeas relief.

32

or more of such crimes." Lockett argues that this charge allowed the jury to find him guilty of murder during the course of a felony without requiring a unanimous finding of what the underlying felony was. Lockett contends that the ability of the jury to choose the felony violates the principle set forth in Schad v. Arizona, 501 U.S. 624 (1991), that a jury must be unanimous as to the means of committing the crime when there is "a material difference" between the various means set forth in the jury instructions. Id. at 633. Finally, Lockett argues that this error cannot be harmless as there is "grave doubt" as to its effect. See California v. Roy, 117 S.Ct. 337, 338 (1996).

We first consider whether we are barred from considering this claim. The State argues that Lockett never presented this claim to the state courts at trial, nor on direct appeal, nor in post-conviction petitions. Therefore, the claim is unexhausted. The State notes that under Mississippi's three-year statute of limitations rule, it is also unexhaustable. For both reasons, the State contends this claim is procedurally barred from our consideration. See Castille v. Peoples, 489 U.S. 346 (1989). The State makes no substantive response to Lockett's argument.

The district court, however, found that "the claim was indeed raised in each of Lockett's direct appeals." (Citing Lockett, 517 So.2d at 1332; Lockett, 517 So.2d at 1355.) That conclusion,

33

however, does not recognize the fact that the Mississippi Supreme Court found this claim to be procedurally barred because of Lockett's failure to raise it at trial. There is no dispute in the record as to the fact that there was no contemporaneous objection at trial, and the Mississippi Supreme Court correctly applied a procedural bar. Therefore, we need not address this matter further as it is procedurally barred from consideration by this court.[25]

B

Issues Related to Sentencing Phase of Case #2

---

[25] Finally, with respect to conviction-related errors, Lockett argues that removal of venireman Crear was error. We presume the correctness of the state court's findings that a juror was removed correctly. See Fuller v. Johnson, 14 F.3d 491, 500-01 (5th Cir. 1997); Russell v. Collins, 998 F.2d 1287, 1293-94 (5th Cir. 1993). Mr. Crear was excused on the basis of his statements that he did not believe in the death penalty and that he would be criticized at church and at home if he participated in a verdict of death. Lockett argues that these statements do not rise to the level of a showing that would "prevent or substantially impair the performance" of his jury duties under Wainwright v. Witt, 469 U.S. 412, 424 (1985).

Lockett presents nothing to persuade us that we should depart from our presumption of correctness of the factual finding below. A trial court may exclude a venire member for cause if his views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with the instructions given and the oath taken by the juror. See Fuller, 114 F.2d at 500. In addition to Crear's comments that Lockett cites above, Crear was asked if he could put aside strong moral and religious beliefs about the death penalty and follow the instructions provided. He responded that he could not do so. These facts clearly rise to the level of preventing or substantially impairing his duties as a juror.

34

We now turn to those issues that pertain only to Lockett's sentence of death for the murder of Mrs. Calhoun. As we have earlier noted, we lack jurisdiction to consider the district court's order granting habeas with respect to the sentencing phase in Case #1 (Mr. Calhoun). This means that the death sentence imposed on Lockett in that case has already been adjudicated as unconstitutionally imposed, and we need address only matters that relate to the death sentence imposed on him in Case #2 (Mrs. Calhoun).

1

We first address whether Lockett's counsel was constitutionally ineffective at the sentencing phase of the trial. After a two-day evidentiary hearing, the district court concluded that Lockett had failed to meet the requirements of the two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984), i.e., deficient performance and prejudice. Specifically, the district court concluded that Lockett's counsel had made a "strategic decision" not to present evidence of Lockett's mental problems on the basis that such evidence might be more harmful than helpful, i.e., the jury might conclude that such evidence was further proof of instability and dangerousness justifying the death penalty. We emphasize that there is no issue of Lockett's competency to stand trial before us. Thus, any psychiatric, psychological, or physiological testimony

35

relevant to such competency is beside the point. The sole issue here relates to whether counsel was ineffective as relates to the sentencing phase. In this respect, the first question that we address is whether counsel was deficient in failing to investigate the sources for mitigation evidence; second, whether the district court erred in holding that counsel's action constituted trial strategy; third, whether there was prejudice resulting from failing to investigate and present the mitigating evidence that would have been available.

2

We first note the standard of review applicable to this issue. The ultimate question of effective assistance of counsel is a mixed question of law and fact that we review *de novo*. See Felder v. Johnson, 180 F.3d 206, 214 (5th Cir. 1999). Under the pre-amendment 28 U.S.C. § 2254(d), which is applicable to this appeal, we are required to afford a presumption of correctness to all district court factual findings if they are supported by the record.[26]

An ineffective assistance of counsel claim is governed by the standards set forth in Strickland v. Washington, supra. We start with the proposition that, under Strickland, "counsel is strongly presumed to have rendered adequate assistance and to have made all

---

[26]See 28 U.S.C. § 2254(d)(8), amended by 28 U.S.C. § 2254(e)(1) (1996).

significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. Here, the initial deficiency asserted against counsel is his failure to investigate the potential information available that might have been presented in mitigation of the death penalty.

3

It is clear that defense counsel's failure to investigate the basis of his client's mitigation defense can amount to ineffective assistance of counsel. See, e.g., Williams v. Taylor, 120 S.Ct. 1495 (2000). When considering a failure to investigate claim the Supreme Court has said, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691.

Lockett argues that his counsel's performance was deficient because his lawyer failed to investigate even the basis of his mental and emotional problems.[27] Lockett refers us to a list of

_____

[27]By failing to brief any other of his arguments related to ineffective assistance of counsel, Lockett has waived those arguments. See East v. Scott, 55 F.3d 996, 1007 n.8 (5th Cir. 1995).

mental problems suffered by Lockett at the time of his murder of Mr. and Mrs. Calhoun, a list that was presented at the habeas evidentiary hearing before the federal district court. Against this list, Lockett notes that his trial counsel effectively put on no evidence for mitigation in his sentencing phases.

We have reviewed the record thoroughly, both in the state court and the district court on this issue. That record overwhelmingly points to the conclusion that Lockett's counsel did little work in investigating possible bases for a <u>sentencing</u> defense for Lockett.[28]

a

Specifically, the state habeas record reflects an overworked defense counsel, trying to present a defense in two death penalty trials a month apart while at the same time trying two other death penalty cases. Defense counsel's December 1988 affidavit states: "Because of my mother's illness and hospitalization and my unexpected appointment to represent two other capital murder defendants while trying to prepare for Carl's two trials, I was simply unable to devote time to investigating the facts and witnesses involved in Carl's case as much as I would have liked to." This admission is borne out in the affidavits of those who testified

---

[28]We stress that Lockett has raised no issue on appeal with respect to his counsel's assistance at the guilt phase of the trial, and the evidence would not have supported any possible effort to question Lockett's competency to stand trial.

38

on Lockett's behalf.  Lockett's mother states:  "Mr. Townsend never approached me to testify at Carl's trials but I asked him if I could testify.  Mr. Townsend asked me what I wanted to say and I told him that I just wanted to say something on Carl's behalf and ask the jury for mercy.  Mr. Townsend said that I could do that, but he never really discussed my testimony with me or suggested anything else for me to testify about.  He never explained to me [the] kind of evidence that would be useful at the sentencing phase of Carl's trial or asked me questions about what kind of person Carl was."  Other witnesses' and potential witnesses' statements are similar.[29]  Although disputed by Townsend, Lockett states:

> Mr. Townsend only met me twice in the entire time while he was preparing my cases for trial.  The first of these meetings lasted only fifteen minutes and the second one lasted for half an hour.  Mr. Townsend never asked me about my childhood. . . . Mr. Townsend never explained to me what kind of evidence was needed at the sentencing hearing.  Mr. Townsend asked me where my blackouts came from and I told him that I was hit on the head when I was younger.  Mr. Townsend never asked any more questions about the subject.

Finally, we note the affidavit of an experienced death penalty investigator, concluding that "[a] thorough case and mitigation

---

[29]Statements are offered by Lockett's brother and sister, both of whom state that Mr. Townsend never talked to them or did so in only the most cursory manner.  We note that one of Lockett's sisters has stated that Lockett referred to himself as "Bradley Armstrong" at as young as fifteen or sixteen years of age.  He also uses a second name now, [Prince] Shaka A'Zulu 13X.  He has signed legal documents under at least one of these signatures since 1986.

investigation was not performed at the time of Mr. Lockett's trial." This investigator concludes that counsel's inquiry fell below the minimum investigation recommended by the American Bar Association. Counsel has no notes of the results of any investigatory work with respect to sentencing. Counsel's testimony at the evidentiary hearing also demonstrates a basic lack of familiarity with the psychological tests that were performed on Lockett. It is undisputed, however, that counsel had notice of possible psychological problems suffered by Lockett, both because of Dr. Summers's and Dr. Johnson's work and his own awareness that Lockett had a history of head injuries.

The medical evidence similarly indicates that Lockett's possible problems were inadequately investigated. For instance, a Dr. Owen testified in the federal habeas proceeding: "[B]ased on the medical and other records which were available in 1986 at the time of Carl's original trial, if I had been hired as an expert for Carl, I would have advised that the aforementioned medical tests to evaluate the extent of Mr. Lockett's brain damage and/or other mental disorders be given to provide mitigating evidence at his sentencing trial."

Indeed, the only effort to explore the mental problems of Lockett was initiated by Lockett's mother when she engaged Dr. Timothy Summers, a psychiatrist, to examine her son. Dr. Summers

40

determined that a thorough evaluation of Lockett required an electroencephalogram, a CT brain scan, and "neuropsychological studies." Summers informed Lockett's counsel that, in his words, "these tests were essential to providing a thorough and complete evaluation [of] Mr. Lockett." These particular tests, however, were never performed, even though the record shows that counsel received this information. Lockett did undergo some preliminary testing. Specifically, Dr. Johnson performed an MMPI[30] on Lockett, but considered the results invalid. However, from counsel's testimony, it appears doubtful that he ever followed up with Dr. Johnson in an effort to understand the tests that were performed and their significance.[31] Furthermore, Dr. Johnson submitted an affidavit in

---

[30]The Minnesota Multiphasic Personality Inventory (MMPI) exam is designed to yield a personality profile of the examinee based on written and oral responses.

[31]Dr. Johnson stated at the evidentiary hearing that he had no notes of any conversation with Townsend in his file, and it would have been his practice to have such notes if such a conversation had taken place. Townsend recalls receiving Johnson's report but stated at the evidentiary hearing that "[it] did not give me any information that I feel that would be extremely helpful to Carl. And I felt like if I used any of this information that Dr. Johnson provided, that it would open up cross-examination and it would open up the state putting mitigation [sic] on, and I felt like any value that I could get by putting this on could be offset by whatever the state would put on."
A Dr. Price testified at the evidentiary hearing before the district court as follows: "[W]hen [Townsend] saw that the test was invalid, he should have asked . . . [that] that test be readministered or a substitute for it made. . . . . An attorney unschooled in the area of psychology but with four years of undergraduate education and a professional degree should have

41

which he states: "I was prepared to testify on Mr. Lockett's behalf, but no one ever contacted me after my evaluation to ask me to relay my findings or discuss my potential testimony.  In particular, I never talked with Mr. Lockett's trial attorney, Mr. William Townsend, whom I expected would call me after he received my reports.  He never called me to discuss my findings, nor did he contact me to testify at Mr. Lockett's trials.  I do not remember talking with Mr. Townsend."  Townsend's notes, however, indicate that he was aware of Lockett's seizure problem and incidents of head trauma.

b

"A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989). We now turn to review whether pursuit of the information available to counsel would have produced evidence relative to mitigating the sentence of death.

The record contains substantial medical expert testimony supporting a conclusion that Lockett suffers a personality disorder and a brain abnormality associated with a documented history of

_____

questioned that invalidity and asked Dr. Johnson to take steps to determine what caused that and to get a replacement evaluation."

seizures.  This evidence is substantiated in part through evidence that Lockett began referring to himself as "Bradley Armstrong" as a teenager or, possibly, from the very beginning of his incarceration.  His confessions contain statements indicating a delusional personality.  At the time of his confession, for example, he claimed to have been having an affair with Mrs. Calhoun.[32]

Most relevant to possible mitigation evidence, however, was expert testimony supporting the opinion that Lockett's seizures may have resulted from temporal lobe epilepsy, caused either organically or as a result of repeated falls as a youth.  Dr. Owen, evaluating Lockett post-sentencing, stated temporal lobe damage "would explain any senseless acts of violence and his eccentric interpretation of reality."[33]  Likewise, a Dr. Margulies stated that, upon review of Lockett's medical records, "it is my opinion that Mr. Lockett very likely has organic brain damage in the frontal and/or temporal

---

[32]The evidence suggests that Lockett suffers other profound delusions, claiming life stories, marriages, children, and careers that have no basis in reality.

[33]Dr. Owen also concluded that "Damage to the temporal lobe can be associated with distinct loss of memory for events, impaired comprehension of language, and with aggressiveness and violent behavior.  Seizure activity in the temporal lobe can be associated with very sudden onset of such violent behavior.  Further, damage to any of a variety of limbic system structures may also result in marked aggression or violence or rage reactions.  Sudden loss of control over aggressive tendencies, such as in explosive episodes, with minimal stimulation, can be found in limbic system lesions."

lobes."[34]  An affidavit submitted by Dr. Price is to the same; indeed, he concludes Lockett presented symptoms of even more severe problems, including a diagnosis of paranoid schizophrenia.  Dr. Margulies testified at the evidentiary hearing that Lockett suffered from a temporal lobe lesion,[35] and Dr. Johnson concluded that "I don't think [Lockett] would have committed the murder absent this temporal lobe lesion."[36]

Although the state's medical experts dispute the severity of Lockett's possible mental problems, they do admit to psychological problems.  For instance, a Dr. O'Brien concluded that Lockett has a below average IQ and that test "results suggested substance abuse

---

[34]Dr. Margulies also stated:  "Major authorities in the field of neurology feel that murderers commonly have frontal and/or temporal brain pathology that contributes to their inability to distinguish right from wrong and to control violent impulses. . . . It is well known that organic pathology in the frontal and/or temporal lobes can impair a person's judgment and impulse control."

[35]Dr. Margulies examined Lockett and Lockett's medical records on November 9, 1994, and based his opinions on the tests he administered during that examination.

[36]Ms. Julie Ann Epps, one of Lockett's previous attorneys in this case, states: "In my twenty-two years of practicing criminal law, I have never represented a criminal defendant with such complicated neurological and psychological problems.  Carl's delusions and fantasies make it difficult to represent him because it is difficult to determine fact from fiction, and everything that Carl says needs to be verified independently.  I do not believe that Carl is being deliberately obstructive.  In fact, he is pleasant and 'cooperative.'  Rather I believe that he is simply unable to distinguish the real from his fictional personae and that he, therefore, is unable to rationally consult with his attorneys and conduct a rational defense."

problems, and paranoid (and other) personality difficulties; [although] results did not suggest psychotic thinking or behavior." A Dr. Guild stated: "In summary, Mr. Lockett represents a Characterlogical Disorder with mixed features. He certainly has schizoid and antisocial features to his personality. I do not see him as representing an Organic Personality Disorder or being psychotic." The State's experts appear to admit to a history of seizures and/or head trauma, and the possible existence of frontal lobe damage.

4

Our review of the above evidence leads us to conclude that counsel's failure to investigate was deficient; it was not an exercise of informed strategic choice. Although he possessed information that plainly suggested the need to investigate Lockett's psychological problems, he did not, to any degree, pursue this information. A reasonably effective defense counsel would have pursued this information. It is also undisputed that there was ample evidence of childhood trauma at home that should have been pursued. In sum, there was enough information before counsel-- repeated head injuries, black-outs, delusional stories, references to self as another name, family troubles, drug and/or alcohol addiction--to put him on notice that pursuit of the basic leads that were before him may have led to medical evidence that Lockett had

mental and psychological abnormalities that seriously affected his ability to control his behavior.  Counsel thus may have had a strong predicate from which to argue to the jury that Lockett was rendered less morally culpable for the ruthless, cruel, and senseless murders he had committed.

The state argues, however, that these alleged failings of counsel to investigate do not constitute ineffectiveness but instead are strategy choices.  <u>Strickland</u>, however, demands more than the mere decision of a strategic choice by counsel.  It requires "informed strategic choices."  <u>Id.</u>

> Essential to the rendition of constitutionally adequate assistance in either phase is a reasonably substantial, independent investigation into the circumstances and the law from which potential defenses may be derived.

<u>Baldwin v. Maggio</u>, 704 F.2d 1325, 1332-33 (5th Cir. 1983).  Indeed, "*Strickland* does not require us to defer to decisions that are uninformed by an adequate investigation into the controlling facts and law."  <u>United States v. Drones</u>, 218 F.3d 496, 500 (5th Cir. 2000).  <u>See</u> <u>also</u> <u>Baxter v. Thomas</u>, 45 F.3d 1501, 1514 (11th Cir. 1995) ("An attorney's decision to limit his investigation, however, must 'flow from an informed judgment.' '[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice among them'")(citations omitted.); <u>Mapes v. Coyle</u>, 171 F.3d

46

408, 426 (6th Cir. 1999) ("[W]hen a client faces the prospect of being put to death unless counsel obtains and presents something in mitigation, minimal standards require some investigation.").

Lockett argues that the district court failed to address this critical basis of his claim, that is, that trial counsel is required to make a reasonable pretrial inquiry into possible mitigating evidence, and, without such investigation, the decision to present no mitigating evidence cannot be considered a "strategic move." See, e.g., Baldwin, supra, 704 F.2d at 1332-33 (Sixth Amendment "requires defense counsel to undertake a reasonably thorough pretrial inquiry into the defenses which might possibly be offered in mitigation of punishment, and to ground the strategic selection among those potential defenses on an informed, professional evaluation of their relative prospects for success."); Glenn v. Tate, 71 F.3d 1204, 1207 & n.1 (6th Cir. 1995). As an example, Lockett points to the fact that trial counsel failed to discover Lockett's brain abnormalities because he failed to perform the medical tests recommended by the psychiatrist retained. Given this, Lockett argues that counsel's "strategic decision" was neither reasonable nor informed.

We agree. This information and the opportunity to weigh this evidence was never before counsel. Consequently, the record will not support the district court's conclusion that counsel could have

47

made an informed strategic choice not to present mitigation evidence at Lockett's sentencing phase.  Furthermore, the state's arguments that Lockett's counsel made a strategic choice either to avoid devastating cross-examination or to prevent the jury from hearing of Lockett's delusions concerning Mrs. Calhoun, are unconvincing because counsel never weighed this possibility of prejudice against any of the mitigating evidence we have noted above.  In sum, the assertion of a "strategic decision" must be rejected because no *informed* decision was made.  See, e.g., Rector v. Johnson, 120 F.3d 551,564 (5th Cir. 1997).  Thus, having concluded that counsel's performance was deficient, we move to the question of ultimate prejudice.

5

Under Strickland's "prejudice" prong, a defendant "must show that there is a reasonable probability that, but-for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

Accordingly, Lockett argues that there was "substantial evidence that would have impacted the sentencing phase. . .".  In addition to the evidence of medical experts, Lockett points to the expert testimony of an experienced death penalty lawyer at the hearing before the district court, who concluded that he did not

48

think there was any question that Lockett was denied effective assistance of counsel at the sentencing phase. Thus, Lockett concludes that the failure to present mitigating evidence should undermine any confidence we might otherwise have in the verdict. See Loyd v. Whitley, 977 F.2d 149, 159-60 (5th Cir. 1992); Blanco v. Singletary, 943 F.2d 1477, 1505 (11th Cir. 1991). The state's counter, as Lockett notes, is essentially nonresponsive. It does nothing to refute the authority and arguments relied upon by Lockett; instead, it only repeats the findings of the district court.

The question of prejudice is a difficult one: Is it reasonably probable that the result of the proceeding would have been different if this evidence had been introduced? There is a tension here between a possible jury finding of reduced culpability versus the possible conclusion that Lockett's mental problems aggravated the threat of future dangerousness. There is also the undeniable gravity, cruelty and deliberateness of the crimes that Lockett committed: a calculated double-murder--involving an ambush, multiple shootings, kidnaping and execution--of an innocent couple. We think that, looking at this evidence in the light of the record as a whole, the failure to investigate and present this information was prejudicial.

A sentence of death in Mississippi requires unanimity among all jurors. See Miss. Code Ann. § 99-19-103. If we can conclude that a juror could have reasonably concluded that the death penalty was not an appropriate penalty in this case based on the mitigating evidence, prejudice will have been established. If the medical opinion testimony in this case--that Lockett suffered from some organic brain disorder that tended to explain his violent conduct and made him less able to control his behavior than a normal person--had been presented to the jury, we think a reasonable juror could have found that his particular mental condition, which resulted from no fault of his own, made him less morally culpable for his cruel and senseless crime. A jury that heard of a troubled upbringing, repeated head injuries, an organic brain abnormality, a history of referring to oneself as an entirely different person, schizophrenia, or other mental problems might have connected these conditions with the evidence that Lockett's motivation in killing the Calhouns may have arisen from either a childhood incident based on Mr. Calhoun's throwing Lockett out of a swimming hole or a delusional notion that he was having an affair with Mrs. Calhoun. We just cannot say with any degree of confidence that an objectively reasonable juror, confronted with this mitigating evidence, might not have reached the conclusion that Lockett lacked the requisite level of culpability to be punished with death.

We are aware, however, that some of this evidence could have harmed Lockett. We are also cognizant of the inherent unforgivable viciousness of this murder, the nature of which may well have inflamed the jury and led them to reject this evidence as rendering him less culpable. But the fact that counsel did not even investigate this mitigating evidence, combined with the general lack of any mitigating evidence before the jury, denied Lockett any opportunity, vouchsafed by the law, to avoid the death penalty. We think that had counsel investigated this issue, it is likely that it "would have altered his counsel's decision, and that the bases underlying his counsel's tactical choice to pursue or forego a particular course would have been invalidated." Lamb, supra, 179 F.3d at 359.[37] Without this evidence, counsel obviously believed that he had no other strategy other than simply to plead for mercy for Lockett.[38]

---

[37]As Dr. Owen concluded: "At the very least, the fact that he was suffering from any one of these disorders would have provided important mitigating evidence because any one of them, much less a combination of them, would have substantially impaired his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law and would have produced extreme mental or emotional disturbance."

[38]At trial, counsel essentially pled only for mercy for Lockett, without mentioning any of the possible mitigating evidence noted above. He failed even to question Lockett's mother--the only witness presented in the Mrs. Calhoun trial--about possible mitigating evidence. As pointed out, counsel "compared Carl to Leopold and Loeb, arguing that Carl could be spared because Leopold had gone on to become a noted scientist while at the same time

51

Thus, we conclude our analysis by holding that, because of his failure to conduct a minimal investigation of Lockett's possible mitigation evidence, counsel's performance was, under Strickland, deficient. Furthermore, because of the credible evidence supporting the conclusion that Lockett suffered from a mental condition that reasonably could have been found by a jury to have decreased his culpability for his crimes, and because an objectively reasonable jury could have rendered a verdict other than death, our confidence in this jury sentencing verdict is undermined. Consequently, Lockett suffered prejudice under Strickland. Lockett has therefore established the denial of his constitutional right to effective counsel at the sentencing proceeding and is entitled to habeas relief from the imposition of the death penalty in Case #2.[39]

VII

In sum, we DISMISS for lack of appellate jurisdiction the State's appeal of the district court's October 16, 1997 judgment reversing the death penalty sentence in the case of John Calhoun. We REVERSE and VACATE, however, the December 16, 1997 judgment granting relief to Lockett on his convictions based on the alleged

---

admitting that Carl lacked the intellectual ability to do so." Given that the jury knew that Lockett had a low IQ, that analogy was sure to convince no one.

[39]We have considered all issues raised in the briefs of the parties. To the extent any of these issues are not addressed or referred to in this opinion, we find them to be without merit.

defect in his indictments.  Further, we REVERSE that part of the October judgment that denied Lockett's claim of ineffective assistance of counsel at the punishment phase of Case #2.  We grant habeas relief in Case #2 by setting aside the sentence of death because of ineffective counsel.  We REMAND for the district court to enter an appropriate judgment not inconsistent with this opinion.

REVERSED, VACATED, and
REMANDED for entry of judgment.