John B. NIXON, Sr., Petitioner,

v.

Edward M. HARGETT, Commissioner, Mississippi Department of Corrections, Respondent.

No. Civ.A. 3:95CV91(BR)(S).

United States District Court, S.D. Mississippi, Jackson Division.

March 28, 2002.

David W. Clark, Bradley, Arant, Rose & White, LLP, Jackson, MS, Brian F. Toohey, Jones, Day, Reavis & Pogue, Cleveland, OH, for Petitioner.

Leslie S. Lee, Marvin L. White, Jr., Office of the Attorney General, Jackson, MS, for Respondent.

## MEMORANDUM OPINION AND ORDER

BRAMLETTE, District Judge.

This cause is before the Court on the Petitioner's Motion to Alter (**docket no. 30–2**) or Amend (**docket no. 30–1**) Judgment Pursuant to Fed.R.Civ.P. 59(e), which was brought before the Court on an evidentiary hearing on October 10, 2001. Having carefully considered the motion and response, the briefs and supplemental briefs, the evidence, oral argument, and all applicable legal authorities, and being fully advised in the premises, the Court finds as follows:

The petitioner's motion was previously addressed in this Court's memorandum opinion and order of March 30, 1999, which vacated the Court's prior judgment denying the petition for writ of habeas corpus under 28 U.S.C. § 2254, and reinstated the stay of execution in Nixon's case. The Court rejected one of Nixon's grounds for reconsideration, and granted a hearing on the remaining three grounds: (1) ineffective assistance of counsel; (2) the trial court's submission of the "especially heinous, atrocious and cruel" aggravating circumstance to the jury; and (3) the state's use of "pecuniary gain" as an aggravating factor. After an extended discovery period and supplemental briefing, an evidentiary hearing was held on October 10, 2001.

The Court presumes the reader's familiarity with its previous opinions, and will not reiterate the facts and findings contained therein except where necessary.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

In its original memorandum opinion and order, this Court denied habeas relief on this issue because (1) the claim was procedurally barred under state law; and (2) the claim was without merit. The Court relied in part on the capital habeas case of *Lockett v. Puckett*, 980 F.Supp. 201 (S.D.Miss.1997), in which Judge William H. Barbour, Jr., denied a similar claim as being procedurally barred and lacking merit. On reconsideration, this Court decided, as Judge Barbour had in *Lockett*, to hold an evidentiary hearing on Nixon's ineffective assistance claims. During discovery and preparation for Nixon's evidentiary hearing, the Fifth Circuit Court of Appeals decided *Lockett v. Anderson*, 230 F.3d 695 (5th Cir.2000), the appeal from Judge Barbour's *Lockett* opinion, in which the appellate court reversed the district court's denial of habeas relief on ineffective assistance grounds.

Lockett had presented at his evidentiary hearing before the district court a list of mental problems from which he suffered at the time of the murder. He also showed that during the sentencing phase of his capital murder trial, his trial counsel effectively put on no evidence for mitigation. *Id.* at 711. The Fifth Circuit found that Lockett's counsel failed to investigate facts available at the time of trial that would have supported the conclusion that his client suffered a "personality disorder" and a "brain abnormality associated with a documented history of seizures." *Id.* at 713. The appellate court concluded "that counsel's failure to investigate was deficient; it was not an exercise of informed strategic

choice." *Id.* at 714. Because of his counsel's failure to make an informed strategic choice, Lockett suffered prejudice and was entitled to habeas relief from the imposition of the death penalty.

At his evidentiary hearing, Nixon argued that his case was similar to Lockett's, and urged the Court to follow the Fifth Circuit's analysis in finding a failure on the part of trial counsel to make an informed strategic choice. The Court has followed the Fifth Circuit's analysis, but finds, despite some similarities with *Lockett,* some fundamental differences in Nixon's case that dictate a different result.

Under the test established by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a habeas petitioner must establish:

> (1) that counsel's performance was deficient in that it fell below an objective standard of reasonable professional service; and

> (2) that this deficient performance prejudiced the defense such that there is a reasonable probability that the outcome of the trial has been undermined and the result would have been different.

*Id.* 466 U.S. at 687–88, 104 S.Ct. 2052.

▮▮▮▮ Nixon must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment; counsel's errors must be shown to be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.; see also Sawyer v. Butler,* 848 F.2d 582 (5th Cir.1988); *superseded on other grounds, Sawyer v. Butler,* 881 F.2d 1273 (5th Cir. 1989); *Lavernia v. Lynaugh,* 845 F.2d 493 (5th Cir.1988); *Bridge v. Lynaugh,* 838

F.2d 770, 773 (5th Cir.1988); *Thomas v. Lynaugh,* 812 F.2d 225 (5th Cir.1987); *Martin v. McCotter,* 796 F.2d 813 (5th Cir.1986). Thus, both a deficiency and resulting prejudice must be shown.[1] *United States v. Lewis,* 786 F.2d 1278, 1281 (5th Cir.1986). A petitioner's failure to establish both prongs of the *Strickland* test warrants rejection of his claim. *Bates v. Blackburn,* 805 F.2d 569, 578 (5th Cir. 1986); *Belyeu v. Scott,* 67 F.3d 535 (5th Cir.1995).

Lockett was tried separately for the murders of John and Geraldine Calhoun. He was represented in both trials by court-appointed counsel, William O. Townsend. Townsend was also appointed to represent Nixon. In *Lockett,* the Fifth Circuit characterized Townsend as "an overworked defense counsel, trying to present a defense in two death penalty trials a month apart while at the same time trying two other death penalty cases." 230 F.3d at 711. One of the other death penalty cases was Nixon's. Nixon's trial was held in March of 1986. Trial in the first Lockett case began April 1, 1986. (Testimony of William O. Townsend, Tr. 71, 3–11).[2] In an affidavit dated December 1988, Townsend stated:

> Because of my mother's illness and hospitalization and my unexpected appointment to represent two other capital murder defendants while trying to prepare for Carl [Lockett]'s two trials, I was simply unable to devote time to investigating the facts and witnesses involved in Carl's case as much as I would have liked to.

*Lockett,* 230 F.3d at 711. Townsend testified that for the same reason, he was

---

**1.** However, there are circumstances where prejudice can be presumed. *See United States v. Cronic,* 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); ·*Woodard v. Collins,* 898 F.2d 1027, 1028 (5th Cir.1990).

**2.** Unless stated otherwise, all transcript references are to the evidentiary hearing of October 10, 2001 ("Tr."), page reference first, followed by line reference.

unable to spend as much time on Nixon's case as he would have liked. (Tr. 71, 12–25; 72, 1).

The Fifth Circuit in *Lockett* quoted Lockett's statement concerning his representation by Townsend:

Mr. Townsend only met me twice in the entire time while he was preparing my cases for trial. The first of these meetings lasted only fifteen minutes and the second one lasted for half and hour. Mr. Townsend never asked me about my childhood.... Mr. Townsend never explained to me what kind of evidence was needed at the sentencing hearing. Mr. Townsend asked me where my blackouts came from and I told him that I was hit on the head when I was younger. Mr. Townsend never asked any more questions about the subject.

*Lockett*, 230 F.3d at 712.

The Fifth Circuit also noted that psychological tests had been performed on Lockett to evaluate the extent of his brain damage and/or other mental disorders; however, Townsend's testimony at the evidentiary hearing before the district court "demonstrate[d] a basic lack of familiarity" with those tests. *Id.* The appellate court also found that it was undisputed that Townsend "had notice of possible psychological problems suffered by Lockett, both because of Dr. Summers's and Dr. Johnson's work and his own awareness that Lockett had a history of head injuries." *Id.*

At Lockett's evidentiary hearing, a Dr. Owen testified that based on the medical evidence available in 1986 at the time of Lockett's original trials, he would have recommended use of the existing psychological tests as mitigating evidence at the sentencing trial. *Id.* Dr. Johnson submitted an affidavit stating that he was prepared to testify on Lockett's behalf after sending his reports to Townsend, but that Townsend never contacted him. *Id.* Town-

send's notes in Lockett's trial file indicated that he was aware of Lockett's seizure problem and incidents of head trauma. *Id.* at 713. However, there were no notes in Townsend's file to show that any investigatory work with respect to sentencing had been undertaken. *Id.* at 712.

An affidavit from an experienced death penalty investigator submitted to the district court in *Lockett* concluded that "[a] thorough case and mitigation investigation was not performed at the time of Mr. Lockett's trial." *Id.* In the investigator's opinion, Townsend's inquiry fell below the minimum investigation recommended by the American Bar Association. *Id.*

The Fifth Circuit noted that "[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Id.* at 713, *quoting United States v. Green,* 882 F.2d 999, 1003 (5th Cir.1989). The court therefore examined "whether pursuit of the information available to counsel would have produced evidence relative to mitigating the sentence of death." *Id.*

To begin with, the record in *Lockett* "contain[ed] substantial medical expert testimony supporting a conclusion that Lockett suffer[ed] a personality disorder and a brain abnormality associated with a documented history of seizures." *Id.* Lockett had a delusional personality, referred to himself as "Bradley Armstrong," created stories about his personal and family life that had no basis in reality, and at the time of his confession claimed to have been having an affair with Mrs. Calhoun. *Id.*

Most importantly, the Fifth Circuit noted evidence linking Lockett's disorders to criminal behavior, specifically murder:

Most relevant to possible mitigation evidence, however, was expert testimony

supporting the opinion that Lockett's seizures may have resulted from temporal lobe epilepsy, caused either organically or as a result of repeated falls as a youth. Dr. Owen, evaluating Lockett post-sentencing, stated temporal lobe damage "would explain any senseless acts of violence and his eccentric interpretation of reality." Likewise, Dr. Margulies stated that, upon review of Lockett's medical records, "it is my opinion that Mr. Lockett very likely has organic brain damage in the frontal and/or temporal lobes." An affidavit submitted by Dr. Price is to the same; indeed, he concludes Lockett presented symptoms of even more severe problems, including a diagnosis of paranoid schizophrenia. Dr. Margulies testified at the evidentiary hearing that Lockett suffered from a temporal lobe lesion, and Dr. Johnson concluded that "I don't think [Lockett] would have committed the murder absent this temporal lobe lesion."

*Id.* at 713–14 (footnotes omitted). While disputing Lockett's experts' testimony, the state's medical experts admitted that Lockett had psychological problems:

For instance, a Dr. O'Brien concluded that Lockett has a below average IQ and that test "results suggested substance abuse problems, and paranoid (and other) personality difficulties; [although] results did *not* suggest psychotic thinking or behavior." A Dr. Guild stated: "In summary, Mr. Lockett represents a Characterlogical Disorder with mixed features. He certainly has schizoid and antisocial features to his personality. I do not see him as representing an Organic Personality Disorder or being psychotic." The State's experts appear to admit to a history of seizures and/or

head trauma, and the possible existence of frontal lobe damage.

*Id.* at 714.

Finding that Townsend "may have had a strong predicate from which to argue to the jury that Lockett was rendered less morally culpable for the ruthless, cruel, and senseless murders he had committed," the Fifth Circuit concluded that Townsend's failure to investigate was deficient performance. *Id.* The court then rejected the state's argument that Townsend was merely exercising his right to make strategic choices, finding that *Strickland* requires *"informed* strategic choices" *id.* (emphasis added), and that "[t]he information and the opportunity to weigh this evidence was never before counsel" as a result of Townsend's deficient performance. *Id.* at 715, 104 S.Ct. 2052.

The Fifth Circuit then moved to the "prejudice" prong of *Strickland,* which required a showing by Lockett of substantial evidence that would have impacted the sentencing phase of his trial, *i.e.,* "but-for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,quoting Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. At the evidentiary hearing, Lockett presented testimony of an experienced death penalty lawyer "who concluded that he did not think there was any question that Lockett was denied effective assistance of counsel at the sentencing phase." *Id.* Lockett argued to the Fifth Circuit that "the failure to present mitigating evidence should undermine any confidence [the court] might otherwise have in the verdict." *Id.*

The court noted that "[t]he question of prejudice is a difficult one." *Id.* On the one hand, there was a possibility that a jury could find reduced culpability; on the other hand, the jury could conclude that Lockett's mental problems aggravated the threat of future dangerousness. *Id.* There

was also "the undeniable gravity, cruelty and deliberateness of the crimes." *Id.*

The question, as posed by the Fifth Circuit, was: "Is it reasonably probable that the result of the proceeding would have been different if this evidence had been introduced?" *Id.* The court found that it was. *Id.* at 716, 104 S.Ct. 2052. Since a death sentence in Mississippi requires unanimity, a finding of prejudice is appropriate if "a juror could have reasonably concluded that the death penalty was not an appropriate penalty in this case based on the mitigating evidence." *Id.*

The Fifth Circuit considered the mitigating evidence—"medical opinion testimony ... that Lockett suffered from some organic brain disorder that tended to explain his violent conduct and made him less able to control his behavior than a normal person" *id,* and found:

A jury that heard of a troubled upbringing, repeated head injuries, an organic brain abnormality, a history of referring to oneself as an entirely different person, schizophrenia, or other mental problems might have connected these conditions with the evidence that Lockett's motivation in killing the Calhouns may have arisen from either a childhood incident based on Mr. Calhoun's throwing Lockett out of a swimming hole or a delusional notion that he was having an affair with Mrs. Calhoun. We just cannot say with any degree of confidence that an objectively reasonable juror, confronted with this mitigating evidence, might not have reached the conclusion that Lockett lacked the requisite level of culpability to be punished with death.

*Id.* Since an objectively reasonable jury could have rendered a verdict other than death, the court's confidence in the sentencing verdict was undermined, and the court found that Lockett suffered prejudice under *Strickland,* entitling him to habeas relief on the ineffective assistance of counsel claim. *Id.* at 717, 104 S.Ct. 2052.

 In the evidentiary hearing before this Court, Nixon offered expert medical testimony in an attempt to establish mitigating evidence similar to that in *Lockett.* Dr. Gerald O'Brien, a clinical psychologist, was first hired by Nixon's attorneys in 1989, some three years after the trial, and visited Nixon at Parchman State Penitentiary in September of that year. (Tr. 174, 13; 174, 8–18). He described the meeting:

I interviewed him and performed some psychological tests to help me do an evaluation, which is—the gist of which is fairly standard for evaluating someone who has been accused of a crime. That is, we talked to him. We looked at issues like his mental status. We did ability testing to see about intellectual functioning. We looked at his cognitive abilities to rule out any sort of cognitive problems or neuropsychological problems, and we also did what most people think of as psychological testing to look at problem areas, personality, et cetera.

(Tr. 175, 20–25; 176, 1–4).

Dr. O'Brien learned that Nixon had grown up in a poor family; that his father and mother had alcohol-related problems; that his father abused him, particularly when he had been drinking heavily; that he had dropped out of school in the seventh grade; and that he began drinking at an early age. (Tr. 176, 11–23). Dr. O'Brien gave the Court his conclusion regarding Nixon's mental or psychological condition:

In my opinion, Mr. Nixon had suffered from chronic alcohol dependence and also suffered from what is called passive-aggressive personality disorder.... [E]ssentially both of these are chronic in nature, in his case certainly, and probably have existed from the time

of his late childhood or adolescence and existed throughout his adult life. (Tr. 177, 12–18). When asked if Nixon's passive-aggressive personality disorder diminished his capacity to appreciate the wrongfulness of his conduct, or to conform his conduct to the law, Dr. O'Brien responded:

The way I would put it is this: His personality disorder, in combination with his chronic alcohol dependence, indeed would affect his ability to appreciate the wrongfulness of his conduct and to conform his behavior to the requirements of the law.

(Tr. 179, 18–22). Dr. O'Brien also testified that he believed, had he been hired prior to Nixon's trial, he would have provided the same opinion at that time.

On cross examination, Dr. O'Brien admitted that a personality disorder, in and of itself, would not cause an inability to distinguish right from wrong. (Tr. 190, 13–15). He also testified that "[a] personality disorder, by its very nature, is not something you want to diagnose after talking to somebody one time because, particularly in a situation such as Mr. Nixon was in at the time I first talked to him, it's not conducive to knowing what he was like, for example, before he was in prison or before he was on death row." (Tr. 194, 2–8). The premeditated murder-for-hire in Nixon's case was described to Dr. O'Brien, and he was asked if his testimony was that Nixon did not know what he was doing. He answered that his previous testimony was that Nixon's personality disorder could "affect his ability to appreciate the wrongfulness of his acts and conform his behavior to the law." (Tr. 206, 1–14). When asked specifically if Nixon's passive-aggressive personality disorder, combined with alcoholism, prevented him from knowing right from wrong in connection with the murder, Dr. O'Brien responded, "Probably not." (Tr. 207, 5–8). When asked if

the same condition caused Nixon to commit the crime, Dr. O'Brien responded, "Probably not." (Tr. 207, 9–12).

The petitioner also offered the testimony of Dr. Doyle Smith, a physician certified to practice addiction medicine. Dr. Smith was first hired in 1995, and he interviewed Nixon at Parchman in 1996. (Tr. 214, 9–21). His evaluation was based solely on Nixon's history. He did not perform any tests. (Tr. 214, 22–25). Nixon described to Dr. Smith a family history in which both his father and mother were alcoholics. Nixon took his first drink at the age of six, but Dr. Smith did not know if he had a history of drinking prior to his teenage years. (Tr. 215, 1–16). Dr. Smith surmised that Nixon joined the Navy at 16 or 17 to get away from an alcohol problem. (Tr. 215, 17–25; 216, 1).

Dr. Smith's testimony regarding the facts on which he based his opinion is sketchy (Tr. 216, 10–25; 217–218; 219, 1–8); nevertheless, he reached a conclusion that Nixon suffered from a severe dependence on alcohol. (Tr. 219, 10–13). When asked if he "believe[d] that Mr. Nixon's severe dependence on alcohol diminished his capacity to appreciate the criminality of his conduct or to conform his conduct to the law," Dr. Smith replied, "Well, I can't give you specifics on Mr. Nixon. . . ." (Tr. 221, 5–9). He later answered in the affirmative the question of whether an *individual* with severe alcohol dependence could fail to appreciate wrongfulness of conduct. (Tr. 16–20). He also testified that if he had been retained before Nixon's trial, he could have delivered the same opinion.

On cross examination, Dr. Smith was asked if, given the facts of this case, Nixon's alcoholism prevented him from knowing the difference between right and wrong. He ultimately answered, "I don't know. He's got it [disease of alcoholism]; but whether or not it happened—occurred

to him at this point in time, I can't say." (Tr. 233, 18–25; 234, 1–20). The following exchange then took place:

Q. Did Mr. Nixon's alcoholism cause him to commit this crime?

A. It could have been a factor.

Q. How would it be a factor—

A. And I don't know—

(Tr. 235, 3–7).

The Court finds Dr. Smith's testimony to be of little value to its inquiry. It is undisputed that Nixon had a problem with alcohol at some point in his life. This is established by other evidence, including Nixon's medical records, and through the testimony of Nixon's sister, Mrs. Walden. It is interesting that Dr. Smith stressed the importance of taking a patient's history from others besides the patient, yet never expressed an interest in interviewing Nixon's own sister, or anyone else. The family history described in Mrs. Walden's testimony is remarkably different than that given Dr. Smith by Nixon. For instance, Mrs. Walden testified that Nixon's mother did not have a drinking problem until much later in life, after Nixon had already left home. (Tr. 169, 7–14). She also testified that the "abuse" Nixon received from his father could be characterized as strict discipline. (Tr. 169, 15–25; 170). The Court finds Mrs. Walden's testimony to be credible.

Dr. O'Brien's testimony, while more substantial than that of Dr. Smith, also shares certain deficiencies with it. Some of his findings regarding Nixon's history, like those of Dr. Smith, conflict with Mrs. Walden's testimony. Although Dr. O'Brien diagnosed Nixon with passive-aggressive personality disorder, there is no real link established between the condition and Nixon's crime.

■ As the Fifth Circuit discussed in *Lockett*, a petitioner alleging ineffective assistance by reason of a failure to investigate "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." 230 F.3d at 713, *quoting United States v. Green*, 882 F.2d 999, 1003 (5th Cir.1989). There was evidence in Lockett's case that he "suffer[ed] a personality disorder and a brain abnormality associated with a documented history of seizures." Nixon's passive-aggressive diagnosis is not of the same magnitude. Moreover, there was evidence linking Lockett's disorders to criminal behavior, an element never established at Nixon's hearing. In fact, Dr. Johnson testified that he did not think Lockett would have committed the murder absent his temporal lobe lesion. *Id.* at 714. The Fifth Circuit, in *Lockett*, found that Townsend's failure to investigate was deficient performance, because Townsend "may have had a strong predicate from which to argue to the jury that Lockett was rendered less morally culpable for his crimes." *Id.*

Might Townsend have been able to uncover an equally strong predicate from which to make the same argument on behalf of Nixon? This Court is of the opinion, based on all the evidence, that he would not. There certainly were no glaring indicators of the kind found in *Lockett* that additional useful evidence was available. Nevertheless, as the petitioner's criminal defense expert testified, "You've got to dig up all of it [mitigation evidence] before you can decide what to do with it."[3]

---

**3.** Thomas Fortner was allowed to testify as a criminal defense expert in the field of capital murder trials, in the form of a proffer, and the Court reserved its ruling on the admissibility of his testimony. The Court notes that a similar expert was allowed to testify in *Lockett*. The Court allows the testimony, but gives it only such weight as it deserves. It is the Court's responsibility to apply the *Strickland* standard to the facts of this case. Fortner's testimony is helpful, however, in understanding the petitioner's arguments regarding mitigation evidence.

Given the Fifth Circuit's admonition to the district court in *Lockett,* that counsel's strategic choices must be *informed* strategic choices, this Court assumes for purposes of this opinion that there was some deficiency in counsel's performance and moves on to the "prejudice" prong of *Strickland.*

Is it reasonably probable that the result of Nixon's sentencing trial would have been different if mitigation evidence in the form of medical testimony had been introduced? In light of the deficiencies of that evidence as discussed above, the Court finds that it is not reasonably probable that the result would have been different. In fact, evidence of Nixon's alcoholism could have inflamed the jury. There is nothing in the testimony of either doctor that would tend to render Nixon less culpable for his crime. The gravity, viciousness and deliberateness of the murder for hire would likely outweigh any mitigation evidence of the type offered at the hearing. The Court finds that Nixon did not suffer prejudice under *Strickland,* and that he is not entitled to habeas relief on this issue.

Other claims of ineffective assistance were made on Nixon's behalf. These have been previously addressed by the Court. Nixon has not shown that the "errors" had more than some conceivable effect on the outcome of the proceedings, nor has he shown that additional testimony would to a "reasonable probability" have convinced an objectively reasonable juror that Nixon should have received a punishment less than death.

Mitigation evidence cannot be presented if none exists or if the defendant adamantly refuses to allow counsel to use it. Townsend was apparently aware of how strong the case against Nixon was, and his plea for mercy during the sentencing phase was sound strategy. It has worked on jurors in previous cases. Any attempt to try and present extensive mitigation evidence for a contract killing could have had an unwanted effect on the jury, possibly turning them away from a life sentence. A plea for mercy based on Biblical references was a sound strategy given the facts of the case and the backgrounds of the jurors. Townsend embraced a theory, mercy, which allowed him to plead for Nixon's life while at the same time placing the prosecution in the position of arguing a basically anti-religious, no mercy stance. Defense counsel's strategy was not ineffective considering the difficult task of presenting mitigating evidence for a contract killing.

■ Nixon claims that the potential mitigation evidence concerning his attempt to save the life of a woman fatally injured in a plane crash should have been presented over his objections. However, this decision was not made by a defendant who was distraught and had lost faith in his attorneys. Nixon did not even inform his attorneys about this evidence. It was only discovered through their pre-trial investigation. For some unknown reason, he did not want this information used in his trial. The cases cited by the petitioner involve fact situations where counsel should have known that their clients were acting emotionally and irrationally. There is no evidence that such an indication was ever displayed by Nixon to his attorneys.

■ Clearly, counsel's strategy to plead for mercy was unsuccessful. This does not mean, however, that Nixon's counsel was ineffective. It is pure speculation that any of the mitigation evidence now offered by Nixon would have had an influence on the verdict. This was a murder for hire. Given the brutal facts of Virginia Tucker's killing, it is not probable that the evidence of a twenty year old attempted rescue when balanced with the fresh evidence of this murder would have resulted in a different decision by the jury. *See Amos v.*

*Scott,* 61 F.3d 333 (5th Cir.1995) (Defendant strongly opposed having witnesses testify on his behalf during sentencing; therefore, failure to interview potential witness held not ineffective assistance).

Where the decision is informed, counsel must be allowed to use his discretion and judgment in deciding whether to call witnesses. Complaints of uncalled witnesses are not favored in a habeas proceeding because the presentation of testimonial evidence is a matter of trial strategy, and because allegations of what a witness would have testified are largely speculative.

Townsend's plea for forgiveness by the jury was reasonable under the circumstances. Counsel did concede that this was a terrible crime, but went on to point out other crimes that were heinous, atrocious or cruel. Contrary to the petitioner's argument, Townsend did not "confess" that the crime was especially heinous, atrocious and cruel. Counsel simply pointed out Biblical crimes which he considered (and hoped the jury would agree) were heinous, atrocious or cruel and related how the individuals involved in these crimes were either punished or forgiven, but their lives were spared.

> ... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland,* 104 S.Ct. at 2065, 104 S.Ct. 2052.

A petitioner shoulders a heavy burden to overcome a presumption that his counsel's conduct is strategically motivated, and to refute the premise that "an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance." *Mes-*

*ser v. Kemp,* 760 F.2d 1080, 1090 (11th Cir.1985). In fact, even where a record is utterly silent with regard to strategy, a reviewing court will presume counsel's action or inaction to be the product of strategy. *Stanley v. Zant,* 697 F.2d 955 (11th Cir.1983); *see also Martin v. McCotter,* 796 F.2d 813, 817 (5th Cir.1986).

The petitioner makes a vague assertion that his counsel's argument to the jury actually conceded guilt. However, counsel simply acknowledged the jury's verdict and asked for leniency. The Sixth Circuit considered this issue in *Stamps v. Rees,* 834 F.2d 1269 (6th Cir.1987). Stamps' counsel only stipulated to what was easily proven. In closing arguments he simply admitted to the facts which had been proven. The court held that counsel was simply following a strategy to provide his client with the most lenient sentence possible. The trial court's failure to inquire whether or not the defendant consented was not error. *Id.* at 1275.

The Fourth Circuit has held that almost anything other than an open confession of guilt should withstand an ineffectiveness claim. *Clozza v. Murray,* 913 F.2d 1092, 1100 (4th Cir.1990). Defense counsel's stated objective to gain credibility with the jury was a reasonable strategy.

> ... [T]here is a distinction which can and must be drawn between a statement or remark which amounts to a tactical retreat and one which has been called a complete surrender.

913 F.2d at 1099. Notwithstanding Nixon's attempts to impeach the verdict, it is impossible for this Court to second guess the jury or to speculate about the impact, if any, that this closing statement had on the jury's deliberations.

Nixon also asserts that his trial counsel failed to conduct "even a minimal investigation of Texas law regarding the 1958 rape conviction" (a "prior violent felo-

ny" aggravating circumstance introduced at the sentencing phase). Nixon assumes, however, that his argument regarding the inadmissibility of this conviction would have been successful. This has already been addressed in the Court's prior opinion, and Nixon produced nothing at the evidentiary hearing to warrant reconsideration. His claim that Townsend should have argued to the jury that statutory rape was not an aggravating factor is not persuasive, because such an argument could easily have backfired against Nixon.

■ The Court is also unpersuaded that the "cumulative effect" of counsel's decisions to keep out evidence produced ineffectiveness. There were sound strategical reasons to keep out evidence of Nixon's military service and other accomplishments, since these could have supported a finding of culpability on Nixon's part. Nixon was simply faced with a lack of compelling evidence in light of this particular crime.

A simple and sincere request for sympathy was a valid defense strategy. It is not rational to believe that witnesses who would have testified that Nixon was a "good," "honest," "reliable" and "hardworking" man would have impressed the jury very much. Even evidence of a deprived childhood in a case involving a 57 year old man would have little, if any, value. This type of testimony, when considered in light of a cold and calculating murder of a woman for money, could easily not have had the desired effect.

In conclusion, the petitioner's allegations of ineffective counsel do not rise to the level at which the Court could question whether "the result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993). Therefore, Nixon has not shown extraordinary circumstances upon which habeas corpus relief may be granted. *See United*

*States v. Shaid,* 937 F.2d 228, 235–36 (5th Cir.1991), *cert. denied,* 502 U.S. 1076, 112 S.Ct. 978, 117 L.Ed.2d 141 (1992). This ground for relief is without merit.

## II. THE TRIAL COURT'S SUBMISSION OF THE "ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL" AGGRAVATING CIRCUMSTANCE TO THE JURY

■ Nixon argues that the "especially heinous, atrocious or cruel" instruction provided in this case was unconstitutionally vague under the rule of *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), because the trial court's definition of the aggravator lacked the precision required by the Eighth Amendment. Nixon further argues that, assuming the validity of the instruction, it was supported by insufficient evidence. He argues that this was an execution-style murder, with no evidence of torture, dismemberment, mutilation or sexual abuse, and no evidence that the victim was subjected to prolonged or deliberate pain.

The Mississippi Supreme Court, in Nixon's appeal, stated:

This Court holds that the facts of the instant case warranted the submission of the "especially heinous, atrocious or cruel" aggravating factor and that the trial court committed no error on this point. *See Evans v. Thigpen,* 631 F.Supp. 274, 285 (S.D.Miss.1986) (The mental anguish and psychological torture suffered by the victim prior to the infliction of the death-producing wound may be considered with respect to the "heinous, atrocious or cruel" factor and make its application constitutionally unobjectionable).

*Nixon v. State,* 533 So.2d 1078, 1098 (Miss. 1987).

The instruction given at trial reads:

The Court instructs the Jury that the term "especially heinous, atrocious, or cruel," as used elsewhere in these in-

structions is defined as being a conscienceless or pitiless crime which is unnecessarily torturous to the victim.

(R. 577, 624).

Nixon's complaint is that this instruction does not also contain language informing the jury that "the actual commission of the capital felony was accomplished by such additional acts as to set the crime apart from the norm of capital felonies." The failure to include this language in this case does not make the instruction unconstitutionally vague. Normally, there are no jurors sitting on a capital murder trial that have served on a capital murder trial previously, and they would not be expected to know what the norm of capital felonies are. The operative language that is necessary in the instruction is that included above. In *Spinkellink v. Wainwright*, 578 F.2d 582, 611 (5th Cir.1978), the Fifth Circuit stated:

> What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart form the norm of capital felonies—*the conscienceless or pitiless crime which is unnecessarily tortuous to the victim.*

(the court's emphasis). The petitioner wishes to enshrine the entire language of the Fifth Circuit; however, the court was

clear that the necessary definition was that the crime was the "conscienceless or pitiless crime which is unnecessarily tortuous to the victim." The failure to include the other language is not error.

In *Lockett v. Puckett*, 980 F.Supp. 201 (S.D.Miss.1997), Judge Barbour addressed the constitutionality of an instruction identical to that given in Nixon's case. Lockett asserted that the instruction was unconstitutionally vague in violation of the Eighth and Fourteenth Amendments to the United States Constitution as interpreted by the United States Supreme Court, citing *Maynard v. Cartwright*, 486 U.S. at 363–64, 108 S.Ct. 1853 (concluding that some of the language used to define the challenged aggravating circumstance— "especially heinous, atrocious, or cruel"— was unconstitutionally vague[4]); *Clemons v. Mississippi*, 494 U.S. 738, 742–43, 110 S.Ct. 1441, 1445, 108 L.Ed.2d 725 (1990) (invalidating an instruction containing only the "bare terms of the Mississippi statute" allowing the jury to consider in aggravation whether the murder was "especially heinous, atrocious, or cruel"); and *Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) (declaring that a habeas petitioner could rely on the *Maynard* holding, even if his conviction became final before that decision, because the decision was not a new decision[5]).

---

**4.** "The jury at Cartwright's trial was instructed that: 'the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; and "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.' *Cartwright v. Maynard*, 822 F.2d 1477, 1488 (10th Cir. 1987), *aff'd*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Although the Supreme Court did not quote or discuss this particular language in its opinion, that Court affirmed the holding of the Tenth Circuit that such language does not sufficiently define the 'especially heinous, atrocious, or cruel' aggravating circumstance. *Id.* at 1488–90; *May-*

*nard*, 486 U.S. at 365, 108 S.Ct. at 1859." *Lockett*, 980 F.Supp. at 211, n. 13.

**5.** "*Maynard* relied on *Godfrey v. Georgia*, 446 U.S. 420, 422, 100 S.Ct. 1759, 1762, 64 L.Ed.2d 398 (1980), a decision which invalidated an aggravating circumstance allowing 'a person to be sentenced to death if the offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.'" *Maynard*, 486 U.S. at 362, 108 S.Ct. at 1858 (*quoting Godfrey*, 446 U.S. at 422, 100 S.Ct. at 1761). The *Godfrey* court concluded that the language was unconstitutionally vague, reasoning that:

The court examined the decisions by the Mississippi Supreme Court addressing the merits of this issue and found:

> In Mississippi, the proper instruction defining the especially heinous aggravating factor comes from *Coleman v. State*, 378 So.2d 640, 648 (Miss.1979): the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim. Lockett received such an instruction at his sentencing trial. . . . The instruction, as given, tracks the *Coleman* language.

980 F.Supp. at 212. The Mississippi Supreme Court had found that the jury in Lockett's case was properly instructed on the especially heinous aggravating factor, and that Lockett's claim was without merit. *Lockett v. State*, 614 So.2d 888, 896 (1992). Lockett argued in his habeas petition to the district court that the essential portion of the *Coleman* language—"the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies"—was not included in the instructions in his trials.

The omission of this language, according to Lockett, failed to properly channel the discretion of the jury as required by *Maynard*. In rebuttal to the argument of the State that the instruction contains a proper limiting definition, Lockett asserts that "Respondents present no cases—either from Mississippi or anywhere else—upholding the constitutionality of such a 'definition.' There are none." . . . .

980 F.Supp. at 212. Judge Barbour, however, agreed with the decisions of the Mississippi Supreme Court, concluding that the instruction given in each of Lockett's trials (identical to the instruction in Nixon's trial) contained a proper limiting definition of the especially heinous, atrocious or cruel aggravating factor, and was constitutionally sufficient.

Lockett's argument that no cases exist upholding the constitutionality of this instruction is not persuasive. The United States Supreme Court has recognized that more than one construction of this particular aggravating circumstance is permissible:

> In *Maynard v. Cartwright*, we expressed approval of a definition that would limit Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance to murders involving "some kind of torture or physical abuse," . . . but we also noted that such a construction was not the only one "that would be constitutionally acceptable."

*Walton v. Arizona*, 497 U.S. 639, 654–55, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990) (emphasis added) (quoting *Maynard*, 486 U.S. at 364–65, 108 S.Ct. at 1859). Thus, even though the United States Supreme Court has implicitly rec-

---

There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as "outrageously or wantonly vile, horrible and inhuman." Such a view may, in fact, have been one to which the members of the jury in this case subscribed. If so, their preconceptions were not dispelled by the trial judge's sentencing instructions. These gave the jury no guidance concerning the meaning of any of [the aggravating circumstance's] terms. In fact, the jury's interpretation of [that circumstance] can only be the subject of sheer speculation.

*Maynard*, 486 U.S. at 363, 108 S.Ct. at 1858–1859 (*quoting Godfrey*, 446 U.S. at 428–29, 100 S.Ct. at 1765). *Lockett*, 980 F.Supp. at 211, n. 14.

ognized the validity of the *Coleman* language as being a "proper definition" for the especially heinous aggravating factor, *Clemons,* 494 U.S. at 751, 110 S.Ct. at 1450, [15] such recognition may not be viewed as a holding that such language is the only proper limiting instruction. Furthermore, in *Clemons,* the Supreme Court discussed the decision of the Mississippi Supreme Court in the following terms:

> The Mississippi Supreme Court distinguished this case from *Maynard* and sustained Clemons' death sentence on the following grounds: ... (2) the Mississippi Supreme Court has previously given the "especially heinous" factor a constitutional limiting construction, narrowing that category to murders that are conscienceless or pitiless and unnecessarily torturous to the victim. . . .

*Id.* at 743–44, 110 S.Ct. at 1445–1446. While such language is not a holding that the emphasized language is the proper limiting construction of the "especially heinous" aggravating factor, it is certainly worth noting that the Supreme Court chose only this language in setting forth the issues addressed by the Mississippi Supreme Court. For these reasons, this Court will not disturb the conclusion of the Mississippi Supreme Court that the challenged instruction sufficiently tracks the *Coleman* language so as to properly channel the discretion of the juries during the sentencing phase of Lockett's trials. Lockett is not entitled to habeas relief based upon this ground.

---

FN15. In discussing the decision of the Mississippi Supreme Court, the Supreme Court in *Clemons* states that "[a]t one point the court recites the proper limiting construction of the 'especially heinous' aggravating factor. . . ." *Id.* at 751, 110 S.Ct. at 1449.

This reference is to the *Coleman* definition of this factor.

980 F.Supp. at 212–13 and n. 15.

In *Billiot v. Puckett,* 135 F.3d 311 (5th Cir.1998), the Fifth Circuit affirmed the district court in finding that the particular "cruel, heinous and atrocious" aggravating factor instruction given in that case was unconstitutionally vague, a point which the State of Mississippi conceded. The Fifth Circuit reversed, however, the lower court's finding that Billiot was entitled to habeas relief because of the infirm instruction. Instead, the Fifth Circuit, relying on *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), held:

> ... [A] federal habeas court must conduct a harmless error analysis of all trial errors, including those occasioned by the sentencer's weighing of an invalid aggravating circumstance, before granting habeas relief. Applying *Brecht* to the facts of this case, we find that the error occasioned by the jury's consideration of the vague aggravating circumstance was harmless because it did not have a substantial and injurious effect or influence on the jury's verdict.

*Billiot,* 135 F.3d at 320.

This Court concludes that the instruction given at Nixon's trial, identical to that given in the *Lockett* case, contained a proper limiting definition of the especially heinous, atrocious or cruel aggravating factor, and is constitutionally sufficient. Assuming, however, that this Court were to find that the heinous, atrocious or cruel factor was unconstitutionally vague, Nixon's death sentence cannot automatically be vacated, as the Fifth Circuit in *Billiot* makes clear.

▮▮▮ Under *Brecht,* habeas petitioners are not entitled to relief based on trial error unless they can establish that it resulted in "actual prejudice." 113 S.Ct. at 1722. *Billiot* provides the procedure to be

followed in this circuit in conducting a harmless error analysis under *Brecht*:

[I]n *Brecht*, the Supreme Court held that a federal habeas court may not grant relief unless the petitioner demonstrates that the error "had a substantial and injurious effect or influence in determining the jury's verdict." We have interpreted this standard in the following manner:

[U]nder *Brecht*, a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. We recognize, however, that if our minds are "in virtual equipoise as to the harmlessness," under the *Brecht* standard, of the error, then we must conclude that it was harmful. *O'Neal v. McAninch*, 513 U.S. 432, 434, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995).

*Woods v. Johnson*, 75 F.3d 1017, 1026–27 (5th Cir.1996). Applying this general standard to the specific review of a vague aggravating circumstance, we note that the error is harmless if the court concludes that either: (1) the sentence would have been the same had the unconstitutionally vague aggravating circumstance not been submitted to the jury at all; or (2) the sentence would have been the same had the unconstitutionally vague aggravating circumstance been properly defined in the instructions. *See Clemons*, 494 U.S. at 753–54, 110 S.Ct. at 1450–51.

*Billiot*, 135 F.3d at 318–19.

The Fifth Circuit addressed whether the sentence in *Billiot* would have been the same had the vague aggravating circumstance been properly defined in the instructions to the jury:

In *Coleman v. State*, 378 So.2d 640 (Miss.1979), the Mississippi Supreme Court, quoting *Spinkellink v. Wain-*

*wright*, 578 F.2d 582, 611 (5th Cir.1978), adopted the following limiting construction of the "heinous, atrocious, and cruel" aggravating circumstance:

What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily tortuous to the victim.

378 So.2d at 648. This construction was approved by the Supreme Court in *Clemons*, 494 U.S. at 750, 110 S.Ct. at 1449. The State argues that had this limiting instruction been given to the jury, the jury would have concluded that the murders were especially heinous, atrocious, and cruel, and would have decided to impose the death penalty given the facts of this case. According to the State, therefore, the unconstitutionally vague instruction did not have a substantial and injurious effect on the verdict reached by the jury. After reviewing the evidence introduced at trial, we agree.

*Billiot*, 135 F.3d at 319.

Assuming the absence of the "norm of capital murders" language were to render the instruction given at Nixon's trial deficient, this Court finds that it is clear from the evidence that the jury would have found the aggravating factor even if they were provided the additional language (*i.e.* that the "capital offense is one accompanied by such additional acts as to set the crime apart from the norm of capital murders"). The instruction without this language, under the facts of this case, cannot be said to have had a substantial and injurious effect on the verdict reached by the jury.

 Nixon also argues that the especially heinous atrocious or cruel aggrava-

ting circumstance should not apply to the facts of his case. However, the Mississippi Supreme Court has repeatedly held that execution-style murders qualify for this aggravating factor. A finding that the victim was mentally tortured by fear of impending death has been held sufficient to justify the "especially heinous" aggravator.[6] There was adequate evidence presented for the jury to conclude beyond a reasonable doubt that this aggravating circumstance existed.

■ Nixon argues that the evidence in his trial was insufficient to support the finding of the "especially heinous, atrocious or cruel" aggravating factor by the jury. In reviewing the sufficiency of the evidence, the Court applies the standard found in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979):

> We hold that in a challenge to a state criminal conviction brought under 28 U.S.C. Sec. 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

*Id.* at 324, 99 S.Ct. 2781. The United States Supreme Court extended the "rational factfinder rule" to the evidentiary sufficiency in support of an aggravating factor in *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

The finding of especially heinous aggravating circumstances was found to exist beyond a reasonable doubt by the jury in Nixon's case. This finding was reviewed on appeal and affirmed. The Mississippi Su-

preme Court held in its opinion that this was an especially heinous crime. Nixon argues that since the evidence was insufficient to support the aggravating factor in *Lockett*, the evidence in his case was also insufficient. However, Mr. Calhoun's death was apparently instantaneous and could not support a finding of the especially heinous aggravating factor. In Nixon's case, the Mississippi Supreme Court found:

> The facts of the instant case indicate that Mr. Nixon forcibly entered the house of a couple who feared he was there to kill them; Nixon fired several shots at Mr. Tucker in the presence of Mrs. Tucker; Mrs. Tucker was wrestled to the floor in preparation for her murder; Nixon held a pistol an inch from Mrs. Tucker's head and fired a bullet into her brain; Mrs. Tucker was left to die, but was found within one-half hour bleeding from the mouth and nose and gasping for breath; and Mrs. Tucker struggled to live but died the next day.
>
> This Court holds that the facts of the instant case warranted the submission of the "especially heinous, atrocious or cruel" aggravating factor and that the trial court committed no error on this point. *See Evans v. Thigpen*, 631 F.Supp. 274, 285 (S.D.Miss.1986) (The mental anguish and psychological torture suffered by the victim prior to the infliction of the death-producing wound may be considered with respect to the "heinous, atrocious or cruel" factor and make its application constitutionally objectionable).

*Nixon v. State*, 533 So.2d at 1097–98. This Court agrees with the Mississippi Supreme

---

**6.** *See Jordan v. State*, 464 So.2d 475 (Miss. 1985) (kidnap victim terrified by the defendant); *Evans v. State*, 422 So.2d 737 (Miss. 1982) (victim knelt behind cash register with a gun to his head, forced to open register, then forced again to kneel on floor, where he

was assaulted and shot); *Bell v. State*, 360 So.2d 1206 (Miss.1978) (gas station attendant forced into car, robbed, driven to wooden area and killed "execution style"; finding of mental torture).

Court. In *Lewis v. Jeffers, supra,* the United States Supreme Court held:

A state court's finding of an aggravating circumstance in a particular case—including a de novo finding by an appellate court that a particular offense is "especially heinous . . . or depraved"—is arbitrary or capricious if and only if no reasonable sentencer could have so concluded. Indeed, respondent agrees that "a state court's 'especially heinous . . . or depraved' finding, insofar as it is a matter of state law, is reviewable by the federal courts only under the 'rational factfinder' rule of *Jackson v. Virginia.*"

497 U.S. at 780–83, 110 S.Ct. 3092 (citation and footnote omitted). This Court finds that under the facts in Nixon's case, it cannot be said that no reasonable factfinder could have found this to be an especially heinous, atrocious or cruel crime. Further, under the harmless error analysis of *Brecht* and *Billiot,* the Court finds that there were two other aggravating circumstances found by the jury to exist beyond a reasonable doubt, justifying the jury's sentence of death even without the "especially heinous" aggravating factor. Nixon is not entitled to habeas relief on this basis.

### III. THE STATE'S USE OF "PECUNIARY GAIN" AS AN AGGRAVATING FACTOR

■ This issue was thoroughly discussed in the Court's previous opinion. Nixon objects to use of "pecuniary gain" as an element of the crime itself, and as an aggravating factor, on the basis that it violated Nixon's constitutional rights by failing to narrow the class of persons eligible for the death penalty. *See Stringer v. Black,* 503 U.S. 222, 232–34, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992).

The Fifth Circuit considered the question in *Wiley v. Puckett,* 969 F.2d 86 (5th Cir.1992), and held that the claim was barred under the new rule prohibition of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct.

1060, 103 L.Ed.2d 334 (1989). Nixon acknowledges that this Court must follow *Wiley,* and that he must seek relief from the Fifth Circuit. The Court notes that a similar argument, that an aggravating circumstance failed to adequately narrow the class of persons eligible for the death penalty because it simply duplicated an element of the crime, was rejected by the Fifth Circuit in *Wingo v. Blackburn,* 783 F.2d 1046, 1051 (5th Cir.1986). *See also Evans v. Thigpen,* 809 F.2d 239, 241 (5th Cir.1987); *Tuilaepa v. California,* 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994); *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). No further discussion of this issue is warranted. The petitioner is not entitled to any relief on this ground, or on any other ground raised in his motion to alter or amend judgment. Accordingly,

IT IS HEREBY ORDERED that the Petitioner's Motion to Alter **(docket no. 30–2)** or Amend **(docket no. 30–1)** Judgment Pursuant to Fed.R.Civ.P. 59(e) is DENIED;

FURTHER ORDERED that John B. Nixon, Sr.'s Petition Under Title 28 U.S.C. Section 2254 for Writ of Habeas Corpus by a Petitioner in State Court Custody Under Sentence of Death is DISMISSED WITH PREJUDICE. A Final Judgment dismissing this action with prejudice and vacating the stay of execution previously entered by the Court shall be issued of even date herewith.